175 F.3d 283
 MTB BANK, Plaintiff-Appellee,
v.
FEDERAL ARMORED EXPRESS, INC.,
Defendant-Third-Party-Plaintiff-Appellant,
MGH Enterprises, a Texas general partnership, Moses
Goldberg, individually doing business as MGH
Enterprises, doing business as House of
Money, Third-Party-Defendant.
 Nos. 97-7668, 98-7256.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 14, 1999.
Decided May 4, 1999.
 
 Susan Condon, Chicago, IL (James T. Ferrini and Andrew C. Jacobson, Clausen Miller P.C., Chicago, IL, Of Counsel), for Defendant-Third-Party-Plaintiff-Appellant.
 Joseph DiBenedetto, New York, N.Y. (Robert M. Buschmann and Amy B. Wagner, Winston & Strawn, New York, NY, Of Counsel), for Plaintiff-Appellee.
 Before: JACOBS, LEVAL and SOTOMAYOR, Circuit Judges.
 LEVAL, Circuit Judge:
 
 
 1
 This is a suit for breach of contract arising out of an alleged misdelivery of two shipments of gold bullion and coins valued at approximately $1.9 million. The action was brought in the United States District Court for the Southern District of New York (Sand, J.). Plaintiff MTB Bank ("MTB" or "the shipper") is a New York commercial bank engaged in the sale of precious metals. Defendant Federal Armored Express, Inc. ("Federal" or "the carrier") is a Maryland-based contract carrier. From 1991 to 1993, the shipper contracted with the carrier for delivery of gold shipments to the shipper's customers in Texas. After one of the shipper's customers failed to pay for two shipments, the shipper sued the carrier to recover its losses. The shipper alleged that by releasing the gold to the customer rather than delivering to the customer in care of the customer's bank, where it was to be held awaiting payment, the carrier negligently breached the terms of the shipping contract.
 
 
 2
 The district court granted the shipper's motion for summary judgment, finding that the carrier had negligently violated the shipper's delivery instructions. We reverse because the contract expressly precludes liability for misdelivery unless the goods were delivered "to a party other than the intended party," and the entity to which the carrier released these shipments was the "intended party."
 
 BACKGROUND
 
 3
 From 1982 to 1993, MTB regularly sold gold bullion and coins to MGH Enterprises, a gold brokerage firm located in Laredo, Texas. MGH's sole proprietor was Moses Goldberg. In 1991, Federal purchased various routes from MTB's former carrier, Loomis Armored, Inc. ("Loomis"). Federal thereafter delivered MTB's shipments of gold to its customers in Texas, including MGH.
 
 
 4
 For each shipment of gold, MTB filled out a pre-printed, multiple-copy shipping receipt provided by the carrier. Each receipt contained "to" and "from" boxes in which the shipper entered the names and addresses of the sender and recipient. When the carrier's drivers arrived at the shipper's vault to pick up the shipments, MTB provided the drivers with completed shipping receipts and sealed canisters containing the gold to be shipped.
 
 
 5
 The receipts set forth the terms of the shipping contract. Pre-printed on the front and back of the receipts were the carrier's standard terms and conditions governing shipment, including several express limitations on its liability. One such provision specified that
 
 
 6
 FEDERAL shall not be liable for the incorrect delivery of a shipment unless FEDERAL delivers, or [the shipper] instructs delivery in writing, to any party other than the intended party and the incorrect delivery is due to negligence on the part of FEDERAL.
 
 
 7
 When shipping gold to MGH in Texas, MTB used a procedure known as "Bank Against Payment." Rather than await payment before shipping gold to MGH, as it had done in the first several years of their relationship, MTB agreed to send each shipment, as soon as the order was placed, to MGH in care of MGH's bank, the Laredo, Texas branch of the International Bank of Commerce ("IBC" or "the bank"). MTB instructed IBC to hold the gold pending MGH's payment to IBC of the purchase price of the gold. For each such shipment, MTB sent to IBC four copies of a standard one-page letter--one by first class mail, one by fax, one inside each sealed cannister of gold, and one in the packing slip envelope on the exterior of each cannister--instructing that the gold was not to be released to MGH until payment was received in full. Under this procedure, each shipment was addressed to:
 
 MGH Enterprises
 
 8
 c/o Int'l Bank of Commerce
 
 1200 San Bernardo
 Laredo, TX 78040
 
 9
 At some point after July 1991, MGH's proprietor Goldberg visited Federal's offices in San Antonio, Texas, and requested a change in delivery procedures. Goldberg told the carrier to deliver directly to MGH in San Antonio, rather than to MGH in care of the IBC bank in Laredo. He introduced his agents, Juan and Javier Guardiola, and stated that the Guardiolas would henceforth sign for and pick up the shipments at the carrier's offices in San Antonio upon arrival. The carrier, which had no knowledge of the Bank Against Payment procedures employed by the shipper, complied with MGH's request. The carrier did not seek or obtain authorization from the shipper to deliver to an address other than the address specified in the shipping receipts, nor did it ask the shipper to clarify its delivery instructions.
 
 
 10
 By 1992, MGH was placing orders for gold with the shipper approximately two times per week, and, notwithstanding the delivery instructions MTB gave to the carrier to deliver in care of IBC in Laredo, the carrier delivered each of these shipments directly to MGH's personnel in San Antonio, as Goldberg had instructed.
 
 
 11
 The two shipments at issue here were ordered by MGH on May 14 and May 18, 1993. The shipments were valued and priced for sale at $949,997.50 and $929,378.00, respectively. The shipper filled out shipping receipts for each order, addressing them to "MGH Enterprises" in care of IBC in the usual fashion described above.
 
 
 12
 The carrier transported the May 14 and May 18 shipments from the shipper's vault in New York to the carrier's own offices in San Antonio. Then, instead of delivering to MGH in care of the bank, the carrier released the shipments of gold to the Guardiolas.
 
 
 13
 In a telephone conversation on May 24, 1993, Goldberg informed Alan Posnick, the shipper's senior vice president, that for some time the carrier had been releasing the shipments directly to MGH's agents in San Antonio rather than delivering them to IBC for release under the Bank Against Payment procedure. The next day, Posnick, along with the shipper's general counsel, Richard Cerick, flew to Texas to meet with Goldberg. At the meeting, Goldberg stated that MGH no longer had possession of the May 14 and May 18 shipments, and was unable to pay for either order.
 
 
 14
 The following day, Posnick and Cerick met with the carrier's San Antonio branch manager, who confirmed that the carrier had been releasing the shipments of gold directly to MGH's agents, the Guardiolas, at the carrier's San Antonio facility. He provided them with copies of the receipts from the May 14 and May 18 shipments. Posnick subsequently telephoned the carrier's Atlanta-based customer service representative and stated that the shipper appeared to be facing a loss as a result of the manner by which the carrier had delivered these shipments. By letter dated June 2, 1993, the shipper notified the carrier that "[a]s a result of [the carrier's] failure to deliver [the May 14 and May 18] shipments as agreed," the shipper had suffered a loss equal to the value of those shipments.
 
 
 15
 On June 3, 1993, the shipper sued MGH and Goldberg in Texas state court, seeking to recover the funds owed from the May 14 and May 18 shipments. The parties eventually reached a settlement in which Goldberg agreed to pay the shipper $1,551,998.36-the contract price of the shipments, minus payments Goldberg had made to MTB that had been allocated to those shipments, plus attorneys' fees, interest, and other minor adjustments. Goldberg filed for bankruptcy shortly afterwards.
 
 Proceedings in the district court
 
 16
 The shipper filed the instant suit on August 5, 1993, contending that the carrier breached the shipping contract by deviating from the delivery instructions, and acted negligently when it acceded to Goldberg's request to release the gold directly to MGH's agents rather than at its bank, without informing or obtaining authorization from the shipper.
 
 
 17
 Both parties moved for summary judgment. The district court granted the shipper's motion by opinion of August 6, 1996. The court noted that the liability of a contract carrier is governed in the first instance by the terms of its contract with the shipper, citing 1 S. Sorkin Goods in Transit § 1.07 (1993). The court found that the carrier had violated the express terms of its contract with the shipper (the shipping receipts), relying on the definition of "shipment" set forth in the carrier's pre-printed shipping receipts. The receipts defined "shipment" as "a single consignment of one or more items of Property ... to one consignee at one location, at one destination address." The court concluded that, by delivering the goods to MGH's agents in San Antonio rather than to MGH in care of the bank in Laredo, defendant had failed to deliver to the "one destination address" specified by the contract.
 
 
 18
 The court noted further that a contract carrier is not strictly liable in tort for misdelivery but may instead be held liable only if it failed to exercise ordinary care, citing Marjan Int'l Corp. v. V.K. Putman, Inc., No. 92-CV-8531 (BN), 1993 WL 541204, at * 5 (S.D.N.Y. Dec.28, 1993). The court noted that this requirement had been expressly included in the parties' contract of carriage, which specified that the carrier would not be liable for misdelivery unless the misdelivery was due to the carrier's negligence. Considering the valuable and non-perishable nature of the cargo, the court found that the carrier, by failing to inform the shipper of the change in delivery procedures or to obtain the shipper's authorization for that change, violated the standard of ordinary care to be expected of an armored carrier.
 
 
 19
 After submission of evidence of the shipper's loss, the court awarded damages of $1,422,314.04. The Court denied the carrier's motion under Fed.R.Civ.P. 60(b) for relief from the judgment.
 
 DISCUSSION
 
 20
 The contract of carriage between the carrier, Federal, and the shipper, MTB, expressly limited Federal's liability for misdelivery of a shipment as follows:
 
 
 21
 FEDERAL shall not be liable for the incorrect delivery of a shipment unless FEDERAL delivers ... to any party other than the intended party and the incorrect delivery is due to negligence on the part of FEDERAL.
 
 
 22
 (emphasis added). The district court found that Federal had negligently delivered to the wrong address. We need not reach the question of Federal's negligence because we conclude that Federal delivered to "the intended party," and was thus protected by the contractual limitation.
 
 
 23
 The shipping receipts were addressed to "MGH Enterprises, c/o Int'l Bank of Commerce, 1200 San Bernardo, Laredo, Texas 78040." So far as it appears on the face of the contract, MGH Enterprises was the "intended party"--the designated recipient or consignee of the shipment. Although the carrier made incorrect delivery--delivery that did not accord with the terms of its contract--the contractual limitation clause expressly provides that it "shall not be liable for incorrect delivery unless [it] delivers ... to any party other than the intended party." Because the carrier made delivery to the intended party, even though at an address that deviated from the intended or specified address, it cannot be held liable for misdelivery under the terms of its contract with the shipper.
 
 
 24
 The shipper argues that its own intentions were to require that delivery be made only in care of the bank. It of course intended that delivery be made in this fashion because it had arranged with the bank that the gold be withheld from MGH until payment was received. Nonetheless, the shipper did not disclose those arrangements in the contract of carriage. So far as the instructions to the carrier directed, MGH was the consignee, or intended party, regardless of the address specified for delivery. Had the shipper focused on the terms of the limitation clause, it could, of course, have protected itself by designating the bank as the consignee of the shipment, for the account of MGH. In that case, the limitation clause would have provided no protection to the carrier if the carrier nevertheless made delivery directly to MGH. But under the facts as they were, the carrier's liability was barred by the contractual limitation.
 
 CONCLUSION
 
 25
 The judgment of the district court is reversed. The case is remanded with instructions to enter judgment for the defendant carrier. Defendant's appeal from the denial of its motion under Rule 60(b) is dismissed as moot.