## ON–LINE TECHNOLOGIES
### v.
## PERKIN ELMER CORP., et al.
### No. 3:99CV2146 (JBA).

United States District Court,
D. Connecticut.

Feb. 1, 2001.

Edward R. Scofield, Jacob D. Zeldes, S. Dave Vatti, Zeldes, Needle & Cooper, Bridgeport, CT, David H. Berg, Berg & Androphy, Houston, TX, Gabriel A. Berg, Berg & Androphy, New York City, Martin A. Gould, Gould, Killian & Wynne, Hartford, CT, David J. Healey, Gary J. Fischman, Goldstein & Healey, LLP, Houston, TX, for Plaintiff.

Jonathan B. Troop, Lorey Rives Leddy, Day, Berry & Howard, Stamford, CT, Robert A. Brooks, Matthew J. Becker, Mark M. Rembish, Day, Berry & Howard, Hartford, CT, for Defendants.

### MEMORANDUM OF DECISION

ARTERTON, District Judge.

According to the Complaint, plaintiff On–Line Technologies (OLT) has achieved advances in Fourier Transform Infrared ("FT–IR") spectrometry, a technology used for gas analysis. While seeking licensing partners to develop applications for its invention, OLT allowed scientists from Perkin Elmer Corporation (PE) and its subsidiaries into its laboratories to test this technology; instead of fruitful partnerships resulting, however, the confidential information obtained during these vis- its was used by the defendants to their own technical and competitive advantage. OLT now brings claims against PE, its German subsidiary, and a number of corporate successors to divisions sold by PE, alleging patent infringement and a variety of state law claims. The defendants now seek to dismiss all but the patent infringement claims, and one defendant seeks to dismiss all counts against it for lack of personal jurisdiction.

## I. FACTUAL BACKGROUND

The Complaint alleges that plaintiff OLT was founded by Dr. Peter Solomon to design, manufacture and sell products based on technology developed by Advanced Fuel Research (AFR), a non-party company also founded by Dr. Solomon. AFR actually developed the FT–IR spectrometry technology that is the subject of this action. In 1991 AFR and OLT entered into a technology transfer agreement by which AFR granted to OLT a "permanent nonrevocable license to [AFR's] technology developments [and] future technology developments for a period of five years," including the FT–IR technology at issue in this case. See 1991 Technology Transfer Agreement, Def.Ex. A. According to the Complaint, this agreement assigned all of AFR's interests in the subject technology to OLT. Complaint ¶ 15.

Dr. Solomon contacted Dr. John Coats, an employee at PE's process analyzer manufacturing division, about the possibilities of using the FT–IR technology to enhance PE's products, including products sold by PE's Real Time Division and a German subsidiary Bodenseewerk Perkin–Elmer GmbH (BSW). At some point in early 1994, a team of scientists from PE visited OLT and AFR's laboratories in East Hartford, and entered into a Non–Disclosure Agreement (Ex. A to the Complaint). After this first visit, a representa-

tive of PE committed "in principal" to a license agreement between PE and OLT, as expressed in a letter from PE's Richard Fyans to OLT's Solomon, in his capacity as president of OLT. Complaint ¶ 16. Dr. Solomon and Dr. Coats continued to meet over June of 1994 to discuss OLT's business plan and its specification for products to be manufactured by PE, and based on these meetings Dr. Coats formulated a memorandum addressed to OLT outlining the performance criteria for the product, an FT–IR Spectrometer. PE, accompanied by a team of scientists from its Real Time Division and its German subsidiary, BSW, then visited OLT's lab in August of 1994 to perform further tests on OLT's technology. Members of the BSW contingent on this visit gave oral assurances to Dr. Solomon that it was obligated to honor the confidentiality agreement between OLT and PE, and based on these assurances Dr. Solomon revealed design technology, performance data, and other trade secrets to PE and BSW scientists. Complaint ¶ 14, 20.

The proposed agreement provided for the payment of a $300,000 signing bonus, a $200,000 advance against future royalties, and envisioned that PE would manufacture the devices and sell them at a "cost plus" basis to OLT, reflecting Dr. Solomon's insistence that OLT remain a competitor in selling FT–IR products. Complaint ¶ 17, Ex. C. This agreement was reduced to writing in a letter from Fyans to Solomon, as president of OLT. In late September 1994, PE and BSW made their final visit to test OLT's technology and, after gaining access to additional confidential information and trade secrets, pronounced the team satisfied with the performance of the product, an integrated Multi–Gas Analyzer. Complaint ¶ 25. Shortly after the September visit, Fyans attempted to alter the proposed terms by eliminating OLT as a competitor of PE; Solomon refused the

new terms, and Fyans then terminated negotiations. Several days later, Fyans claimed that the reason for the change in the proposed agreement was that the integrated Multi–Gas Analyzer had failed in performance, even though no member of the testing team raised such a concern, and possible solutions to performance problems had been addressed at the outset of negotiations in the Coats memorandum. Complaint ¶ 26–27. Dr. Coats later wrote a letter to Solomon in which he explained that the agreement had terminated because BSW was concerned that its gas analyzer product was incapable of competing with OLT's. Complaint ¶ 28.

Dr. Solomon wrote to PE seeking assurances that PE and BSW would abide by their confidentiality obligations, and received those assurances from Charles Heinzer. On August 8, 1995 a patent (the "143 patent") covering the basic design of OLT's integrated gas analyzer technology was issued and assigned to OLT. In December of 1998, however, Solomon received an e-mail from the lead scientist on the BSW team informing him that PE and BSW had used the proprietary information they had obtained in their visits to the lab to design and develop a new gas analyzer.

OLT's corporate counsel wrote to Tony White, PE's CEO, to give notice of OLT's claims in January of 1999. In May of 1999 PE sold the Environmental and Process Analysis Division of BSW (known as the UPA Business) to a German corporation called Sick A.G. (Sick AG), which continued BSW's operation as Sick, UPA, GmbH (Sick UPA). Plaintiff claims that a portion of the UPA Business' assets include the misappropriated technology used to manufacture PE's product, the MCS 100 E, and that PE's chief patent counsel assured OLT that all prospective purchasers had been notified of OLT's claims. Subsequently, in June of 1999 the Analytical

Instruments Division of PE, which included the remaining divisions of the BSW subsidiary, was sold to EG & G, which then changed its name to Perkin–Elmer, Inc. Plaintiff claims that its misappropriated technology also accounted for a portion of the value of the Analytical Instruments Division, because the technology has broad applications and could be used in other products besides the gas analyzer industry. Complaint ¶ 35.

In June of 1999, OLT and AFR executed a Technology Transfer Agreement which transferred the AFR's interest in the FT–IR technology as well as any and all legal claims arising from the foregoing facts to OLT. The Complaint alleges that this Transfer Agreement was simply a "renewal" of the 1991 Agreement, as was done in 1996. Complaint ¶ 15.

Plaintiff OLT has sued PE, BSW, EG & G, Sick UPA and Sick AG, alleging: 1) patent infringement against PE, BSW, Sick UPA and Sick AG; 2) misappropriation of trade secrets/Connecticut Uniform Trade Secrets Act (CUTSA) violation against PE, BSW, EG & G, Sick UPA and Sick AG; 3) breach of contract against PE and BSW; 4) breach of duty of confidentiality against PE and BSW; 5) fraud against PE and BSW; 6) CUTPA violations against PE and BSW; and 7) unjust enrichment against PE, BSW, EG & G, Sick UPA and Sick AG. Defendants PE, BSW, EG & G and Sick UPA seek to have the Second through Seventh claims dismissed for failure to name a necessary and indispensable party under Rule 12(b)(7); in addition, defendants EG & G and Sick UPA move for judgment on the pleadings under Rule 12(c) on the claims of misappropriation of trade secrets and unjust enrichment. Defendant BSW moves under Rule 12(c) for judgment on the breach of contract count, the common law breach of duty of confidentiality count, and the fraud count, while defendant PE moves for judgment under 12(c) only with respect to the common law breach of duty of confidentiality count. Success on all aspects of the defendants' motion would leave only the patent infringement claims against PE, BSW and Sick UPA. Sick AG also moves to dismiss all the counts against it for lack of personal jurisdiction.

## II. DISCUSSION

### A. *Motion to Dismiss for Failure to Join an Indispensable Party*

■ Rule 19(a) defines the following parties as necessary, and requires their joinder when feasible:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may i) as a practical matter impair or impede the person's ability to protect that interest, or ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

If a party does not qualify as necessary under Rule 19(a), the Court need not decide whether its absence warrants dismissal under Rule 19(b). *See Viacom Internat'l v. Kearney,* 212 F.3d 721, 724 (2d Cir.2000). But where the court makes a threshold determination that a party is necessary under Rule 19(a), and joinder of the absent party is not feasible for jurisdictional or other reasons, the court must then determine whether the party is "indispensable." If the court determines that

a party is indispensable, the court must dismiss the action pursuant to Rule 19(b). Rule 19(b) provides that the factors to be considered in making this determination include:

> First, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by shaping relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Fed.R.Civ.P. 19(b). No one factor is determinative, nor should the Court necessarily place more emphasis on one factor over another. 4 James Wm. Moore, Moore's Federal Practice § 19.05[1][A]. "[T]he language of Rule 19(b) leaves the court with great latitude, and requires a factual determination more than a legal one." *ConnTech Dev. Co. v. University of Conn. Educ. Properties Inc.*, 102 F.3d 677, 682 (2d Cir.1996).

Defendants contend that AFR is a necessary and indispensable party to this litigation, and that under Rule 19(b) all claims except the patent infringement claims should be dismissed due to plaintiff's refusal to join AFR. Defendants point to the numerous references to AFR in the Complaint and the fact that Solomon signed the Non–Disclosure Agreement in his capacity as president of AFR as proof that AFR is a necessary party to this litigation. Defendants argue that AFR is indispensable because, despite the Transfer Agreement, it would be at substantial risk of multiple obligations as AFR, the inventor of the technology at issue, could bring the same claims asserted against the defendants in this action in a separate case, thus resulting in defendants having to pay in excess of its actual liability. *Cf. Avon Cosmetics (FEBO) Ltd. v. New Hampton, Inc.*, No. 90 Civ. 7208(RLC), 1991 WL 90808 (S.D.N.Y. May 22, 1991). Further, defendants maintain that AFR is indispensable because it is the signatory to the Non–Disclosure agreement, upon which all other claims except the infringement claims are based. Defendants dismiss the Transfer Agreement, since OLT and AFR can terminate the Transfer Agreement "upon mutual consent," and since that consent could be achieved effectively with the nod of Dr. Solomon (the Chairman of the Board of both companies).

According to plaintiff, AFR is neither a necessary nor an indispensable party, and as such defendants have failed on both steps of the Rule 19 inquiry. The primary focus of its argument is the June 1999 Transfer Agreement, which provides that AFR "absolutely assigns to On–Line and On–Line hereby accepts the absolute assignment to use for any application or purpose whatsoever" the FT–IR technology, and further that AFR "also absolutely assigns any contracts, claims, causes of action, and right to sue exclusively to On–Line based on the 'AFR Technology' or any agreement or right related to the 'AFR Technology.'" Def.Conf.App.Ex. C ¶¶ 1, 2. Since AFR has transferred all interests in this litigation to OLT, plaintiff's argument continues, it does not "claim an interest relating to the subject of the action" nor will its absence leave defendants subject to a substantial risk of incurring multiple obligations. Plaintiff points out that under the Transfer Agreement AFR would have no standing to pursue any claims against defendants, and attaches to its opposition an affidavit from Dr. Solomon stating that as a result of the Transfer Agreement, "AFR expressly disclaims any interest in the above captioned lawsuit, or any future suit, which arises out

of the facts asserted by On–Line in its Second Amended Complaint against any of the named Defendants to this action." Solomon Aff., Ex. 3, ¶ 7.

■ The Transfer Agreement and Dr. Solomon's affidavit persuade the Court that the purposes of Rule 19 would not be served by a dismissal here. The consistently-renewed transfer agreements confirm the allegation in the Complaint that AFR was the research and development arm, while OLT was founded to do business with the technology developed by AFR. To the extent the rescission by mutual consent provision in ¶ 15 of the agreement leaves AFR with some sort of contingent reversionary interest in the claims asserted in this litigation, the affidavit of Dr. Solomon effectively removes any risk that the defendants will be subject to further suits on the same claims. Connecticut law permits the assignment of claims for injury to property interests. *See Iseli Co. v. Connecticut Light and Power Co.*, 211 Conn. 133, 136–137, 558 A.2d 966 (1989) (citing Restatement 2d, Contracts § 547(1)(d) for proposition that " 'An assignment of a claim against a third person or a bargain to assign such a claim is illegal and ineffective if the claim is for : . . . (d) damages for an injury the gist of which is to the person rather than to property, unless the claim has been reduced to judgment.' "); *Whitaker v. Gavit*, 18 Conn. 522 (1847). Further, agreements regarding trade secrets may be assigned, *see Holden v. Crown Chemical*, 19 Conn.Supp. 85, 110 A.2d 288 (1954). Defendants have cited no authority that would cast doubt on the legitimacy of the assignment of AFR's rights here. Given the express disclaimer in Dr. Solomon's affidavit and the absolute

language of the transfer agreement, if the Chairman of both corporations later attempted to reverse course and assert claims on behalf of AFR against PE, such claims would clearly be estopped.

The centrality of the Transfer Agreement, and its effect in eliminating any possibility that multiple suits will be brought against defendants, distinguishes the cases cited by defendants in support of their motion. In *Viacom Int'l v. Kearney*, 190 F.R.D. 97, 101 (S.D.N.Y.1999), for instance, the court concluded that the corporation that was the subject of an asset purchase agreement was a necessary and indispensable party in litigation between the buyer and seller; one factor that weighed heavily in the court's decision was the fact that the non-party corporation had initiated a parallel state action seeking injunctive relief on nearly identical grounds. *Id.* at 101.[1] Similarly, in *Smith v. Kessner*, 183 F.R.D. 373 (S.D.N.Y.1998), another case on which defendants rely, the court dismissed an action for failure to join an indispensable party where the partnership through which the plaintiff had made the investments that were the subject of the lawsuit had filed a state court action against some of the defendants based upon the same transaction and seeking the same relief. The court concluded that there was a substantial risk that defendants would face multiple liability, as evidenced by the parallel action, and therefore dismissed the case, as the partnership could not be joined without destroying diversity jurisdiction. 183 F.R.D. at 376. There is no parallel state court action here, and the possibility that one could be brought is nonexistent, given the sworn statement of

1. Since the parties filed their briefs in this case, the Second Circuit has since reversed the *Kearney* decision on other grounds, but noted that it found "a serious question as to whether Taylor Forge qualifies as a "neces-sary" party under Rule 19(a) and, a fortiori, whether [the purchased corporation] is an "indispensable" party within the meaning of Rule 19(b)." *Viacom Int'l v. Kearney,* 212 F.3d 721, 724 (2d Cir.2000).

Dr. Solomon and the unambiguous language of the Transfer Agreement. The speculative possibility that some contingent reversionary interest may still exist, and would be asserted despite the CEO's express statement to the contrary, does not meet the standard that a "substantial risk" of inconsistent adjudications or multiple liability be shown.

Finally, a number of the cases cited by defendants were decided on the grounds that allowing the action to proceed without a necessary party would be prejudicial to that non-party, as the non-party could be adversely affected by negative precedent and exposed to the consequences of collateral estoppel, without the ability to protect its interests in the litigation. *See Spiro v. Parker Brothers*, No. 91 Civ. 7759, 1992 WL 197405 (S.D.N.Y. Aug. 4, 1992); *Kawahara Enterprises v. Mitsubishi Electric Corp.*, No. 96 Civ. 9631, 1997 WL 589011 (S.D.N.Y. Sept. 22, 1997). Here, the non-party has expressly disclaimed any interest in participating in the litigation, and the close ties between OLT and AFR insure that any residual interests of AFR will be adequately protected by OLT.

Defendants do point to some case law holding that a signatory to a contract that is the subject of the action is the quintessential indispensable party under Rule 19, and therefore since Solomon signed the Non–Disclosure Agreement in his capacity as president of AFR, AFR must be joined to the claims based on that contract. *See, e.g., Travelers Indemnity Co. v. Household Int'l Inc.*, 775 F.Supp. 518, 527 (D.Conn. 1991). None of the cases cited by defendants, however, involved an assignment of rights by the contracting party. Defendants argue that the assignment of rights does not change the analysis because the Non–Disclosure Agreement between AFR and PE has not been the subject of a novation, and thus AFR still remains a party to the contract. A novation, however, releases AFR from all its rights *and* obligations under a contract, and transfers those obligations to another party, thus effectively creating a new contractual duty. 15 Samuel Williston, A Treatise on the Law of Contracts § 1865 at 590 (3d ed.1972); *see Gateway Co. v. DiNoia*, 232 Conn. 223, 233, 654 A.2d 342 (1995). An assignment of a right, in contrast, is "a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance." Restatement (Second) of Contracts § 317 (1979). In other words, a novation is not required to extinguish AFR's rights under the Non–Disclosure Agreement; instead, the assignment was sufficient to transfer those rights to OLT.

A number of courts have concluded that an assignment renders a contracting party dispensable for purposes of Rule 19. As Wright & Miller put it, "[a]n assignor of rights and liabilities under a contract is not needed for a just adjudication of a suit brought by the assignee; indeed, in most cases the assignor would not even be a proper party inasmuch as he may have lost his right to bring an independent action on the contract by virtue of the assignment." Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 1613 at 188–189 (2d 1986); *see, e.g. Overseas Devel. Disc. Corp. v. Sangamo Constr. Co.*, 686 F.2d 498, 505 n. 18 (7th Cir.1982) ("Unless local law qualifies the rights of the assignee (e.g., of certain tort claims), or the assignor has repudiated the assignment, or the assignment is wholly executory, the assignor is not an indispensable (Rule 19(b)) party. Even where the assignment is partial, the assignor and the assignee may be necessary parties, but they will not be indispensable (Rule 19(b)) parties."). While the Court has found no Second Cir-

cuit cases reaching the same conclusion, the reasoning is persuasive. The Connecticut Supreme Court has recently noted a trend towards allowing the free assignability of contract rights, *Rumbin v. Utica Mutual Ins. Co.*, 254 Conn. 259, 267, 757 A.2d 526 (2000), *citing* Restatement (Second), Contracts § 317, p. 15 (1981) ("[a] contractual right can be assigned"); J. Murray, Jr., Contracts (3d Ed.1990) ("the modern view is that contract rights should be freely assignable"), and the contract assignment here would be valid under Connecticut law, as it does not contain an anti-assignment provision, nor is it a contract for services of a personal nature. The Transfer Agreement thus nullifies defendant's argument that a contract signatory is a necessary party.

Therefore, AFR is not a necessary party within the meaning of Rule 19(a), as it does not claim an interest relating to the subject of the action (and in fact has expressly disclaimed such an interest), and its non-participation would not leave defendants subject to substantial risk of inconsistent obligations, nor is it indispensable under Rule 19(b), because the close relationship between AFR and OLT demonstrates that any judgment in this case will be adequate to protect AFR's interests and will not prejudice it. The motion is therefore denied.

### B. *Rule 12(c) Motions*

■ The standard for deciding a motion pursuant to Rule 12(c) for judgment on the pleadings is the same as the one applicable to a motion to dismiss under Rule 12(b)(6). *See Irish Lesbian and Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2d Cir.1998). "Under that test, a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant; it should not dismiss the complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir.1994), *quoting Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (internal quotation marks omitted).

### 1. *EG & G and Sick UPA's Motion for Judgment on the Pleadings with Respect to the Misappropriation Claim*

■ The Complaint alleges that in May of 1999, PE sold its subsidiary BSW's UPA Business to Sick UPA, and that a portion of the UPA Business' assets include the misappropriated technology used to manufacture the MCS 100 E. Complaint ¶ 34. In June of 1999, the Complaint continues, PE's entire Analytical Instruments division, including the BSW subsidiary, was sold to EG & G. Complaint ¶ 35. The Complaint also alleges that "Defendant Sick knew the technology it acquired from PE was Plaintiff's proprietary information" because prior to the sale of the UPA business, PE's Chief Patent Counsel assured plaintiff that "any prospective purchaser of the UPA business has been informed of the claims made" by the plaintiff. Complaint ¶ 51. Defendants EG & G and Sick UPA now seek to dismiss the misappropriation claim against them, arguing that because the Non–Disclosure Agreement expired of its own terms in April of 1999, there could not have been any misappropriation in May and June of 1999.

A "trade secret" is defined under CUTSA as information that "(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to

maintain its secrecy." Conn.Gen.Stat. § 35–51(d). Misappropriation is defined as:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without express or implied consent by a person who (A) used improper means to acquire knowledge of the trade secret; or (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was (i) derived from or through a person who had utilized improper means to acquire it; (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . .; or (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

The allegations in the Complaint track the elements of misappropriation. Paragraph 51 pleads: 1) that Sick UPA knew the technology it acquired from PE included plaintiff's proprietary information; 2) that Sick UPA had reason to know that the technology was acquired by improper means, as it includes a representation from PE's patent counsel that potential purchasers of the UPA business had been informed of OLT's claims. Therefore, the issue to be decided is whether the Complaint adequately alleges that the information at issue constitutes a trade secret.

Defendants contend that the proprietary information in this lawsuit is not a trade secret within the meaning of CUTSA because the non-disclosure obligation had expired at the time of the acquisitions in question. Because OLT did not require the parties to the agreement to maintain its confidentiality in perpetuity, they argue, after expiration of the agreement "PE and BSW were free to use or disclose OLT's information in any way they saw fit," Mem. in Support at 19, and as such the information acquired by EG & G and Sick UPA could not be considered trade secrets.

The Court disagrees that OLT could prove no set of facts in support of its misappropriation claim against Sick UPA. First, the Court notes that the language of the Non–Disclosure Agreement provides that the five-year period runs from the date of disclosure, not from signing, and therefore the sales to EG & G and Sick UPA would be within the scope of the agreement, as they occurred within less than five years from the date of the last visit. Second, even accepting that the Non–Disclosure Agreement had expired, the Complaint alleges that OLT had received other assurances regarding PE and BSW's intentions to maintain confidentiality. From these allegations, the Court can infer that the Non–Disclosure Agreement was not the only effort on the part of OLT to maintain the information's secrecy. The plaintiff's complaint suggests circumstances under which trade secrets were created or maintained pursuant to other efforts, not just the Non–Disclosure Agreement. Defendants may be correct that no confidentiality obligations attached after the expiration of the agreement, but more of a factual record is needed before the Court can draw this conclusion. The motion is therefore denied as to Sick UPA.

■ The Complaint, however, contains no allegation from which it can be inferred that EG & G had any reason to know of OLT's claims when it purchased the Analytical Instruments Division. Paragraph 51 alleges that PE's Chief Patent Counsel informed OLT that all prospective purchasers of the UPA Business had been put on notice of OLT's claims, but EG & G did

not purchase the UPA Business—instead, they purchased what was left of the Analytical Instruments Division, including the BSW subsidiary, after the UPA Business had been sold to Sick, AG. Plaintiff argues that its pleadings "reflect its good faith belief that PE Inc. may be culpable." [2] At oral argument, plaintiff suggested that EG & G's knowledge could also be inferred from the fact that PE's Chief Patent Counsel moved over to EG & G after the sale. This allegation does not appear in the Complaint, and even if it were included, it would not help plaintiff's case. The mere facts that plaintiff's technology has broad scientific application, that PE represented it was informing potential purchasers of the UPA business of OLT's claims, and that one attorney eventually transferred to the successor corporation do not, in the Court's view, add up to an allegation that the purchaser of the entire Analytical Instruments Division had reason to know that some of the value of the business it was purchasing stemmed from the alleged acquisition of confidential information by improper means. As the Complaint does not plead that EG & G "knows or has reason to know" that the division it was purchasing had improperly acquired confidential information from OLT, Count Two is dismissed against EG & G only.

### 2. Breach of Contract and Breach of the Duty of Confidentiality Claims

■ PE and AFR were the only signatories of the Non–Disclosure Agreement, but nonetheless plaintiff pursues breach of contract claims against BSW, arguing that BSW is bound by the agreement due to certain verbal assurances indicating BSW's assent to the terms of the Non–Disclosure Agreement. Paragraph 14 of the Complaint alleges that "PE and Bodenseewerk understood ... that all proprietary information disclosed by both AFR and On–Line's technology... was covered by the terms of the Non–Disclosure Agreement." The complaint further alleges that scientists from BSW, a direct competitor of OLT, were let into the OLT/AFR lab based on the terms of the Non–Disclosure Agreement "as well as assurances that the information shared would be kept confidential." Complaint ¶ 9. Defendant BSW maintains that since it signed no written document, any purported oral agreement between it and OLT is unenforceable under Connecticut's Statute of Frauds.[3] Defendants PE and BSW further argue that the fourth count, which alleges breach of the common law duty of confidentiality, is preempted by CUTSA.[4]

OLT relies on the doctrine of part performance as an exception to the statute of frauds to preserve its breach of contract claim against BSW:

> Contracts that would otherwise be unenforceable without a writing sufficient to comply with the Statute of Frauds, General Statutes § 52–550, are nonetheless

---

**2.** PE Inc. is the name taken by EG & G after buying PE's Analytical Instruments Division.

**3.** In relevant part, the Statute of Frauds provides that "[n]o civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged ... (5) upon any agreement that is not to be performed within one year from the making thereof." Conn.Gen.Stat. § 52–550(a)(5).

**4.** As to Count IV, which alleges breach of the common law duty of confidentiality against PE and BSW, by way of a letter dated December 27, 2000, counsel for plaintiff advised the Court that OLT was withdrawing this count as a separate claim, but would continue to press these allegations as part of its misappropriations and breach of contract claims. Accordingly, defendant's motion to dismiss Count IV is granted.

enforceable because of part performance if two separate but related criteria are satisfied. First, the contract alleged must satisfy the evidentiary function of the Statute of Frauds. To constitute part performance the conduct relied upon must be referable to and consistent with the oral agreement. Second, the conduct alleged to have been induced by reliance on the oral agreement must be of such character that repudiation of the contract by the other party would amount to the perpetration of a fraud. H. *Pearce Real Estate Co. v. Kaiser*, 176 Conn. 442, 443, 408 A.2d 230 (1979). The *Pearce* court summarized these criteria as requiring that "the party seeking enforcement, in reasonable reliance on the contract and on the continuing assent of the party against whom enforcement is sought, has so changed his position that injustice can be avoided only by specific enforcement." *Id., citing* Restatement (Second), Contracts § 197 (1973).

Plaintiff has adequately alleged part performance, as it claims that BSW was allowed to enter the OLT/AFR laboratories to view the technology, and PE gave "assurances" after the license agreement negotiations broke off that "PE and Bodenseewerk ... would abide by its obligations of confidentiality." Complaint ¶ 29. As BSW is a direct competitor of OLT, this alleged conduct is consistent with the existence of an oral agreement, as it is "of such a character that [it] can be naturally and reasonably accounted for in no other way than by the existence of some contract in relation to the subject matter in dispute ...." *Rutt v. Roche*, 138 Conn. 605, 608, 87 A.2d 805 (1952). Plaintiff still must plead facts to support the proposition that failing to find an enforceable agreement would "amount to perpetration of a fraud." *See, e.g., Harmonie Club v. Smirnow*, 106 Conn. 243, 249, 137 A. 769 (1927) ("The doctrine of part performance arose from the necessity of preventing the statute against frauds from becoming an engine of fraud."). Whether plaintiff has met the Rule 9(b) standard of pleading fraud with particularity such that plaintiff's contract claim is viable is discussed in the next section in conjunction with BSW's challenge to the viability of Count Five on the same grounds. For the reasons outlined in that discussion, the Court concludes that the Complaint pleads fraud with sufficient particularity, and the motion to dismiss the contract claim against BSW is accordingly denied.

### 3. *Rule 9(b) Challenge to Fraud Claims*

■ Count Five alleges fraudulent inducement on the part of PE and BSW; defendant BSW has moved to dismiss the claim for failure to plead with particularity. As discussed above, plaintiff's claim for breach of contract against BSW also must meet the Rule 9 pleading requirements in order not to be barred by the statute of frauds. Defendant maintains that both counts fail to meet this standard.

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." The Second Circuit has required that "when a complaint charges fraud, it must (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir.1996). While Rule 9(b) allows a party to plead state of mind generally, "we must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations."

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995). Accordingly, plaintiff must allege facts that give rise to a strong inference of fraudulent intent. *Id.*

Defendants seek to dismiss the fraud count against BSW, arguing that the Complaint contains the necessary specific facts about PE only. Defendants emphasize that all of the specific facts in the Complaint, including allegations identifying speakers and particular statements, relate to PE. While the Complaint alleges that PE and BSW "never intended to abide by the terms of the license agreement" and that PE and BSW "mislead (sic) the Plaintiff into revealing Plaintiff's proprietary information related to its FT–IR, ²⁰⁄₀₀ long path cell, and gas analyzer technology from April until November of 1994," Complaint ¶ 65, the only fact alleged to support this conclusion is the June 6, 1994 letter from PE's Richard Fyans that purportedly made a number of representations in order to induce OLT to disclose its proprietary technology. *Id.* PE and BSW then allegedly used performance failures as a false excuse for backing out of the license agreement, by way of PE's Fyans November 2, 1994 termination letter.

Plaintiff points to two paragraphs that it claims salvage its fraud count. Paragraph 31 of the Complaint alleges that in December of 1998, Dr. Solomon received a letter from a BSW employee in Germany, Berkhahn, who "admitted that PE and BSW had violated the terms of the Non–Disclosure Agreement" and that PE and BSW had "used the proprietary information it learned in 1994 to design the cell for PE and BSW's new MCS 100 E gas analyzer." Complaint ¶ 31. After seeing OLT's technology, paragraph 31 continues, PE and BSW "decided to design a cell with [the] same characteristics" and that PE and BSW "copies key features of the long path cell to be integrated into its

MCS 100 E...." *Id.* Plaintiff also relies on paragraph 28, which outlines a letter to Dr. Solomon from Dr. Coats of PE which was written after Fyans terminated the license agreement negotiations for purported performance problems, advising that "the lack of performance was not the issue that destroyed the deal. Rather, [BSW] had already spent the money to engineer and manufacture an emissions monitoring system which was significantly more expensive than On–Line's systems" and consequently BSW did not want its parent company to aid OLT in the manufacture of a product with which BSW would be unable to compete. Complaint ¶ 28. According to plaintiff, ¶ 31 sufficiently alleges fraud because it admits the fraud, misappropriation, and patent infringement, and ¶ 28 alleges the beginning of a "conspiracy to defraud" between PE and BSW. Mem. in Opp. at 24.

The Court finds that the facts as alleged provide sufficient support for a fraud claim. In the Second Circuit, the necessary strong inference of fraudulent intent can be created by: (1) alleging facts to show that defendants had both motive and opportunity to commit fraud, or (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994). While the "motive and opportunity" test is most usually applied in the securities context, it can be used to demonstrate fraud in the garden-variety commercial contract situation. *See S.Q.K.F.C. v. Bell Atlantic Tricon Leasing Corp.*, 84 F.3d 629 (2d Cir.1996) (applying "motive and opportunity" test to determine whether fraud pled with sufficient particularity under Rule 9(b) in case alleging fraud in contract negotiations). Paragraphs 28 and 31 provide the motive for fraud: BSW's manufacture of a competing product with

less efficient and more costly technology, and the allegation that upon gaining access to OLT's technology, BSW designed a new gas analyzer incorporating those innovations. The opportunity to commit fraud is found in paragraphs 20 and 24, which allege that BSW scientists were able to visit OLT laboratories and conduct tests, view performance data, and gain access to confidential information such as pricing and manufacturing costs, all based on representations that BSW would observe the Non–Disclosure Agreement.

These allegations, outlining both BSW's motive and opportunity to commit fraud, provide the "strong inference of fraudulent intent" necessary under Rule 9(b). Plaintiff's failure to identify specific BSW speakers and statements is not fatal to its claim, because the clear thrust of plaintiff's fraud claim is that it assumed BSW would abide by the confidentiality obligations of its parents, was not advised to the contrary by any BSW representative, and based on that assumption allowed a competitor access to proprietary and confidential information. Such a claim alleges a form of "fraud in the omission," in that BSW is alleged to have defrauded OLT by not speaking. It is patently obvious from plaintiff's Complaint that BSW would not have been admitted to the laboratories without this understanding, and the Complaint sufficiently advises BSW of OLT's theory in this regard. Demanding more would be to engage in a shell game, requiring plaintiff to identify specific speakers and statements when the very crux of the Complaint is that there were none. *See Alevizopoulos and Associates v. Comcast Int'l Holdings, Inc.*, 100 F.Supp.2d 178, 184 (S.D.N.Y.2000) (finding that 9(b) standard requiring allegations specifying speakers and statements does not apply "where the alleged fraud is the omission of certain acts rather than affirmative misrepresentations," because "the policy underlying Rule 9(b) would not be served by requiring particularization of statements when no such statements exist.").

The Court concludes that the present Complaint meets the threshold requirements of Rule 9(b), and any further testing of plaintiff's theory must await factual development. Accordingly, defendant BSW's motion to dismiss Count V is denied. As noted above, because plaintiff has adequately alleged fraud, its breach of contract claim against BSW also survives the statute of fraud defense, and the motion to dismiss Count III is denied as well.

### 4. Unjust Enrichment Claims Against EG & G and Sick UPA

■ Defendants EG & G and Sick UPA seek to dismiss the seventh claim for relief, which alleges unjust enrichment. Defendants mount a variety of challenges to this claim, but the Court need only address one aspect of defendants' argument, as it agrees that the claim is preempted by CUTSA.

CUTSA provides that "[u]nless otherwise agreed by the parties, the provisions of this chapter supersede any conflicting tort, restitutionary, or other law of this state pertaining to civil liability for misappropriation of a trade secret." Conn.Gen. Stat. § 35–57(a). The statute expressly states, however, that it does not effect "(1) Contractual or other civil liability or relief that is not based upon misappropriation of a trade secret...." Conn.Gen.Stat. § 35–57(b)(1). Plaintiff argues that its claim is saved from preemption based on the allegation that the unjust enrichment was the result of fraud, and because it seeks an equitable remedy. Plaintiff cites no case law addressing this proposition, and the Court cannot locate any precedent which would support such an argument.

Connecticut courts do not appear to have addressed the precise issue of CUTSA's preemption of unjust enrichment claims, but a number of other courts in states whose statute mirrors the Uniform Trade Secrets Act have concluded that unjust enrichment claims are preempted when the claim depends on the information at issue being deemed a trade secret. *See Frantz v. Johnson*, 999 P.2d 351 (Nev. 2000) (where unjust enrichment claim arose from single factual episode of misappropriation of bidding and pricing information, claim was preempted, because unjust nature of the claim was dependent on facts concerning misappropriation of trade secrets); *Micro Display Systems, Inc. v. Axtel, Inc.*, 699 F.Supp. 202, 205 (D.Minn. 1988) ("To the extent a cause of action exists in the commercial area not dependent on trade secrets, that cause of action [for unjust enrichment] continues to exist").

OLT argues that some of the confidential information which was allegedly misappropriated might not fit within the definition of trade secrets, but would nonetheless have value such that the purchasers of the PE division would have been unjustly enriched. In the Court's view, however, OLT has plead nothing that is not a protectable trade secret. The advances in FT/IR technology owned by OLT derive their value from being confidential, and it is the confidential nature of the information at issue which allowed EG & G and Sick UPA to gain a competitive advantage, thus enriching them unjustly, according to the Complaint. OLT does not allege the rendering of services without compensation, the wrongful retention of property, or the taking of anything other than the information at issue in this case. The wrongful conduct alleged in Count IX is that defendants "have unjustly failed to pay Plaintiff for the use

of Plaintiff's trade secrets and patented technology" and that "the failure to compensate Plaintiff for its trade secrets and patented technology has worked to Plaintiff's detriment...." Complaint ¶ 76. This paragraph makes clear that plaintiff seeks to recover only for the misuse of protectable trade secrets and/or patented information, and the claim is therefore preempted. Of course, plaintiff still has recourse to unjust enrichment as an element of recovery under CUTSA, to the extent those damages are not accounted for in calculating actual losses. *See* Conn.Gen.Stat. § 35–53. But because OLT's unjust enrichment claim does not allege any ill-gotten gains other than those resulting from the misuse of confidential information, OLT cannot bring a stand alone claim for unjust enrichment. The motion to dismiss the unjust enrichment claims against EG & G and Sick UPA is therefore granted.

### 5. *Summary*

To summarize, the Court concludes that OLT has adequately alleged fraud against BSW, and the claim for misappropriation of trade secrets against Sick UPA is sufficient to withstand a motion for judgment on the pleadings under Rule 12(c). The Court grants the motion to dismiss as to the preempted misappropriation count (Count Two) against EG & G, the unjust enrichment claim against EG & G and Sick UPA, and the breach of duty of confidentiality claim (Count Three) against PE and BSW, which has been withdrawn.

### C. *Defendant Sick AG's Motion to Dismiss for Lack of Personal Jurisdiction*

The Complaint alleges that Sick AG is located in Waldkirch, Germany, and that it is the parent company of Sick UPA, its wholly-owned subsidiary that acquired the

shares of BSW's UPA business in May of 1999. Complaint ¶ 5. The rest of the complaint collectively refers to both entities without differentiation, alleging that "Sick" is subject to jurisdiction in this Court under Connecticut's long-arm statute, that "Sick" had actual knowledge of OLT's claims before it purchased BSW, and that "Defendant Sick could reasonably foresee being haled into court in Connecticut." Complaint ¶ 7. Defendant Sick AG argues that this attempt to blur the corporate distinctions between the corporate parent and its subsidiary is insufficient to assert personal jurisdiction over Sick AG, both under the long-arm statute and the Due Process clause, and that Sick AG's only involvement in this case is its ownership of Sick UPA. Sick AG therefore moves to dismiss all claims against it under Rule 12(b)(2).

### 1. *Standard*

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant. *See Metropolitan Life v. Robertson–Ceco Corp.,* 84 F.3d 560, 566 (2d Cir.1996). Prior to discovery, a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction. *Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.), *cert. denied,* 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990). After discovery, the plaintiff's prima facie showing necessary to defeat a jurisdiction testing motion must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant. *Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.1990). As the parties were allowed a limited period to conduct jurisdictional discovery prior to the bringing of this motion and rely on that information in their various motions seeking

and opposing dismissal, the *Ball* standard applies, and the Court will accordingly look to information outside the pleadings in deciding the motion.

The parties do not dispute that personal jurisdiction in this patent infringement and diversity case is governed by the law of the forum state, Connecticut. In determining personal jurisdiction, Connecticut utilizes the familiar two-step analysis. First, the Court must determine if the state's long-arm statute reaches the foreign corporation. Second, if the statute does reach the corporation, the court must decide whether that exercise of jurisdiction offends due process. *Bensmiller v. E.I. Dupont de Nemours & Co.,* 47 F.3d 79, 81 (2d Cir.1995).

### 2. *Undisputed Facts Regarding Sick AG's Connections to Connecticut*

Sick AG does not own any property in the state of Connecticut, does not maintain any offices, employees or agents in Connecticut, and has never been authorized to transact business in Connecticut. Hoehne Dec. ¶ 4 (Def.Ex.A). There have, however, been some interactions between Sick AG and OLT prior to the events at the root of this lawsuit. In late 1994 a Sick AG employee, Dr. Wolfgang Hartig, accompanied by an employee of Sick AG's United States subsidiary, visited OLT's labs in East Hartford to review and analyze the FT–IR technology. Upon return to Germany, he reduced his impressions of the technology to writing in a "visit report" that recounted several manufacturing problems in the technology and advised that the technology not be pursued at that juncture. Mem. in Opp. (Doc. # 48) Ex. B at 7. In August of 1995, Dr. Hartig's successor at Sick AG, Volker Wilke wrote Dr. Solomon to reestablish contact and asked for further information on the FT–IR technology, which he received by way of a general promotional

brochure sent from OLT's labs in East Hartford to Germany. Mem. in Opp., Ex. B at 4. Sick AG did not purchase the technology from OLT at that time or enter into any collaborative licensing agreement; rather, OLT claims, Sick AG "obtained the technology it had reviewed and evaluated at On–Line through its purchase of Bodenseewerk from Perkin Elmer." Mem. in Opp. at 4. Near the end of 1998, Sick AG became interested in purchasing BSW's UPA division, which BSW was apparently shopping around, and in the spring of 1999, Sick AG negotiated to buy the UPA Business of BSW by transferring the stock of the reserve company (now Sick UPA GmbH) from BSW to Sick AG. On four occasions during the course of the negotiations, which took place in Germany, Sick AG was made aware of OLT's claims against BSW, and the notice letter from OLT's patent counsel to PE ultimately became an exhibit attached to the purchase agreement, according to plaintiff. Three Sick AG employees (including Wilke) also spoke to two PE employees in the Norwalk office regarding the sale on two separate occasions. Mem. in Opp. at 5. Plaintiff also alleges that "Sick AG is actively marketing products that use the stolen technology as well as infringe the patent in Connecticut through its interactive website," and that this fact alone is sufficient to create jurisdiction. Defendant Sick AG agrees with the basic recitation of facts, but argues that there is no evidence of any connection between Hartig's visit to view the technology and Sick AG's later acquisition of BSW, nor is there any indication that Sick AG knew of the substance of BSW's contacts with OLT, although it was made aware of the claims. Defendant further argues that there is no justification for piercing the corporate veil here simply based on Sick AG's ownership of Sick UPA and the nature of the corporate transaction by which it was acquired. Finally, Sick AG maintains that the two instances of contact between Sick AG and OLT and Sick AG's web site together are insufficient to create personal jurisdiction under the long-arm statute, and that due process would be offended by requiring them to defend the case here.

### 3. Long–Arm Statute

OLT alleges that Sick AG is a foreign corporation that is subject to the jurisdiction of this Court under Conn.Gen.Stat. § 33–929. Plaintiff identifies the following sections of the long-arm statute as providing jurisdiction in this case:

(f) Every foreign corporation shall be subject to suit in this state ... whether or not such foreign corporation is transacting or has transacted business in this state and whether or not it is engaged exclusively in interstate or foreign commerce, on any cause of action arising out of the following ... (2) out of any business solicited in this state by mail or otherwise if the corporation has repeatedly solicited business, whether the orders or offers related thereto were accepted within or without the state; ... (4) out of tortious conduct in this state, whether arising out of repeated activity or single acts, and whether arising out of misfeasance or nonfeasance.

Conn.Gen.Stat. § 33–929(f).

### a. Tortious Conduct in Connecticut

Plaintiff argues that § 33–929(f)(4) confers jurisdiction over Sick AG, because Sick AG misappropriated its trade secrets, as defined in Conn.Gen.Stat. § 33–51 (see discussion supra regarding the definition of misappropriation including parties who know or have reason to know that trade secrets were acquired by improper means), and has infringed its patent. These tortious acts qualify as taking place "within Connecticut," OLT continues, because: 1)

Sick AG knew that BSW's technology was in fact plaintiff's misappropriated technology, as a result of Dr. Hartig's 1994 visit, and knew that the decision to buy this stolen technology would impact OLT in Connecticut; 2) part of the negotiations to buy BSW's UPA division were conducted over telephone calls between PE employees in Norwalk and Sick AG officials in Germany; and 3) it would be inequitable to allow Sick AG to avoid the Court's jurisdiction, when it knew of OLT's claims at the time it purchased the division.

In effect, plaintiff is arguing that because the consequences of defendant's acts impacted plaintiff in Connecticut, the tortious conduct occurred here as well. The cases cited by plaintiff in support of this position, however, all addressed the constitutionality of this test for due process purposes, not the separate long-arm analysis. *See Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) (jurisdiction was proper under due process clause in state where effects of tortious conduct were felt); *Keeton v. Hustler Magazine,* 465 U.S. 770, 777, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) (jurisdiction predicated on effects in the state constitutionally proper, and since state long-arm statute allowed assertion of jurisdiction whenever permitted by Due Process clause, long-arm statute satisfied as well). The Second Circuit has rejected such an argument when premised solely on Connecticut's long-arm statute, affirming Judge Burns' dismissal of a case where the plaintiff argued that the conduct of the defendant foreign corporation "was targeted at a Connecticut company that necessarily felt the sting of the defendants' actions in its home state." *General Star Indemnity v. Anheuser–Busch Co.,* 1999 WL 1024708, 199 F.3d 1322 (2d Cir.1999) (summary order). The Second Circuit concluded that such consequences were

not enough, as Connecticut law did "insist that a defendant's tortious conduct be directly and expressly targeted at the forum state." *Id.* at *3–4. Allowing jurisdiction based on the in-state effects of conduct "would obliterate the longstanding distinction between long-arm statutes that reach tortious conduct in a given state and those that reach conduct which causes tortious injury in the state by action outside the state." *Id., citing Bross Utils. Serv. Corp. v. Aboubshait,* 489 F.Supp. 1366, 1372, n. 35 (D.Conn.1980) (Cabranes, J.) (noting that Connecticut's long-arm statute subjects non-resident individuals to jurisdiction in the state for tortious acts outside the state having effects in the state but contains no similar provision for corporations and relying upon this omission to reject a broad reading of the "tortious conduct in this state" provision).

Patent infringement may constitute a "tort" for purposes of long-arm jurisdiction, but the infringement must take place in the forum state in order for jurisdiction to attach. *See Neato v. Great Gizmos,* No. 3:99cv958 (AVC), 2000 WL 305949 (D.Conn. Feb. 24, 2000), *citing North American Philips Corp. v. American Vending Sales, Inc.,* 35 F.3d 1576, 1579 (Fed.Cir.1994) ("the 'tort' of patent infringement occurs where the offending act is committed"). Presumably, the "infringement" that plaintiff alleges occurred in this state is the act of selling products that infringe on OLT's patent. Mem. in Opp. at 10. An affidavit by Jens Hoehne, Sick AG's Vice President of Corporate Marketing and Sales, is attached to defendant's memorandum in support of the motion to dismiss, and avers that:

> Sick AG does not engage in or transact any business in the State of Connecticut. Sick AG does not import, manufacture, use, sell or distribute its products, or offer its products for sale, in the State of

Connecticut. Sick AG has no customers and does not solicit any customers in the State of Connecticut. Hoehne Aff. ¶ 6. To dispute this claim, in its brief plaintiff OLT highlights the Sick AG website, at the web address *www. sick.de* and argues that the web site provides a sufficient basis for jurisdiction, since it allows customers to purchase allegedly infringing products.

Courts that have considered the issue of whether web presence creates personal jurisdiction in a particular forum have categorized Internet use into three areas for the purpose of determining whether the exercise of personal jurisdiction is permitted. *See VP Intellectual Properties v. IM-TEC Corp.,* 53 U.S.P.Q.2d 1269 (D.N.J. 1999). At one end of the spectrum are cases where individuals can directly interact with a company over their Internet site, download, transmit or exchange information, and enter into contracts with the company via computer. In such cases, the exercise of jurisdiction is appropriate, particularly when combined with evidence of sales from the forum state. *See Compu-Serve, Inc. v. Patterson,* 89 F.3d 1257 (6th Cir.1996). At the other end of the continuum are cases where the defendant has only advertised on the Internet, and where another medium such as the telephone or mail is necessary to contact the seller; in the case of such "passive" sites, personal jurisdiction usually does not lie. *See Bensusan Restaurant Corp. v. King,* 937 F.Supp. 295 (S.D.N.Y.1996). The middle ground between the two extremes involves sites where parties can interact with the defendant company, but may not be able to contract with the company or make purchases over the Internet site; in such situations, most courts follow the lead of the Western District of Pennsylvania in *Zippo Mfg. Co. v. Zippo Dot Com, Inc.,* 952 F.Supp. 1119 (W.D.Pa.1997) and determine whether jurisdiction is proper by "examin-ing the level of interactivity and commercial nature of the exchange of information that occurs on the Web site." 952 F.Supp. at 1124. *See, e.g., Search Force v. Data-Force Int'l,* 112 F.Supp.2d 771 (S.D.Ind. 2000) (noting that the Fifth, Ninth, and Tenth Circuits have relied upon the analytical framework set out in *Zippo Mfg.* to determine the propriety of exercising jurisdiction based on Internet activity).

■ From the description of the website in the parties' papers, the Sick AG website lies in the middle ground along the interactivity spectrum, in that the customer can exchange information with Sick AG, but the website does not allow for direct purchases online. The case cited by the plaintiff for the proposition that personal jurisdiction can lie in such a "middle ground" case where the web site serves as a site for exchanging information also involved evidence that the defendant corporation had consummated over 250 transactions with residents of the forum state. *See Mieczkowski v. Masco Corp.,* 997 F.Supp. 782 (E.D.Tex.1998) (upholding jurisdiction where web site allowed customers to view a catalog of products, check the status of an order on-line, and where evidence showed that sales to Texans accounted for 3.2% of defendant's gross income, and stating that "[t]he Court need not decide today whether standing alone the Web site maintained by the defendant is sufficient to satisfy a finding of general jurisdiction. Nor must it look only to the traditional business contacts that the defendant has with the State of Texas. Rather, it is the combination of the two that leads the Court to the conclusion that the defendant maintains substantial, continuous and systematic contacts with Texas sufficient to subject it to personal jurisdiction."); *see also VP Intellectual Properties,* 53 U.S.P.Q.2d at 1272 ("middle ground" website that allowed for exchange

of information regarding products but did not provide means for purchasing online insufficient to provide specific or general jurisdiction over seller of allegedly infringing product, where no evidence that product was sold in New Jersey, and website advertisement did not constitute "offer to sell" in that state where no specific pricing information was included).

There is a further wrinkle to this case that cuts against exercising personal jurisdiction over Sick AG based on the website. While Sick AG's website is interactive to a degree, in that information can be exchanged, there is no provision for purchasing, and as was the case in *VP Intellectual Properties,* pricing information for the allegedly infringing product is not included. Further, the "interactivity" on the website predominantly directs the user to a corporate subsidiary other than Sick AG. For instance, if a user wishes to contact Sick AG about a product, they must select from a pull-down menu of countries, and are directed to the U.S. subsidiary when U.S.A. is selected. It is impossible to enter directly into a contract for sale solely on the website: further communications, such as telephone contacts, are necessary. Further, when product information for the MCS 100 E is downloaded, as demonstrated by plaintiff's Exhibit J, the brochure bears the contact information for defendant Sick UPA, not Sick AG. Plaintiff characterizes the number of different corporate entities here as a "rope a dope" strategy, but there has been no suggestion that the activities here justify piercing the corporate veil, and accordingly the different corporate structures must be given effect. *See Koehler v. Bank of Bermuda Ltd.,* 101 F.3d 863, 865 (2d Cir.1996) ("The corporate veil will be pierced for jurisdictional purposes, however, only when the subsidiary is acting as an agent for the parent, or the parent's control is so com-

plete that the subsidiary is a "mere department" of the parent.").

In conclusion, the website is insufficient to establish personal jurisdiction over Sick AG under the "tortious conduct" prong of Connecticut's long-arm statute, Conn.Gen. Stat. § 33–929(f)(4), as the website primarily involves the exchange of information, additional avenues of communication must be utilized to accomplish a sale of a product, most interactive inquiries are channeled to other corporate entities than Sick AG, and there has been no showing that any Connecticut sales of the infringing product occurred.

b. *Solicitation of Business Under Conn.Gen.Stat. § 33–929(f)(2)*

 Plaintiff also argues that the exercise of jurisdiction would be proper under § 33–929(f)(2), which conveys jurisdiction over a foreign corporation on any cause of action arising out of business solicited in this state "by mail or otherwise if the corporation has repeatedly so solicited business." Plaintiff claims that the Hartig visit in 1994, the letter in 1995, and the telephone calls to PE in Norwalk during the negotiations to purchase BSW's UPA Business demonstrate the requisite repeated solicitation of business. The Court disagrees. First, as noted above, there is no connection between the 1994 and 1995 contacts by Sick AG and the eventual purchase of BSW, except for plaintiff's argument in the brief that these events were part of a continuous course of conduct by Sick AG aimed at acquiring the FT–IR technology for itself. These Sick AG visits are not even referenced in the Complaint, demonstrating that even the plaintiff did not view them as part of the case until jurisdiction was challenged, much less that this case "arise[s] out of" those visits. Aside from plaintiff's speculation, there is nothing filling the lengthy gap between

August 1995 and March 1999 that would allow the Court to infer the repeated solicitation of business.

The one case cited by plaintiff, *Xerox v. Axel Johnson Energy Dep't*, 1993 Conn.Super. 107824 (April 2, 1993), involved a defendant that had an office in the state and had received a certificate to transact business in the state. The court observed that "a foreign corporation transacts business in this state by performing an important combination of functions, including exercising discretion and making business decisions," and concluded that it had *in personam* jurisdiction over a claim seeking to compel arbitration, when the decision to refuse to proceed to arbitration was made at the Stamford, Connecticut office. This case does not provide support for this Court's assertion of jurisdiction over a German corporation that purchased the German subsidiary of a Connecticut corporation, when the contacts with Connecticut were at most two telephone calls. PE may have been exercising discretion and making business decisions in this state regarding the sale, but there is simply no allegation or proof that Sick AG did the same. Accordingly, § 33–929(f)(2) does not provide the grounds for long-arm jurisdiction over Sick AG.

### c. Transacting Business Under Conn. Gen.Stat. § 33–929(e)

Section 33–929(e) provides that "[e]very foreign corporation which transacts business in this state in violation of section 33–920 shall be subject to suit in this state upon any cause of action arising out of such business." The statute confers local jurisdiction over a foreign corporation on two conditions: the transaction of business in this state, and a cause of action arising out of the transaction of such business. *Lombard Bros., Inc. v. General Asset Management Co.*, 190 Conn. 245, 251, 460 A.2d 481 (1983) (under predecessor statute § 33–411(b)). Plaintiff points to the 1994 and 1995 contacts, the website, and the acquisition deal to argue that Sick AG "transacts business" in Connecticut within the meaning of the long-arm statute.

Section 33–920(b), however, also contains a list of activities which do not constitute transacting business within the meaning § 33–920(a). These include: " ... (6) selling through employees or agents or otherwise, if the orders require acceptance outside this state before they become contracts; ... (9) owning, without more, real or personal property; (10) conducting an isolated transaction that is completed within thirty days and that is not one in the course of repeated transactions of a like nature; and (11) transacting business in interstate commerce." Conn.Gen.Stat. § 33–920. The Court agrees with Sick AG that it falls within these exceptions. The 1994 visit, to the extent it could be considered a transaction, was completed within thirty days, and the 1995 fax is such a minor interaction that it does not even rise to the level of a transaction. It is pure speculation on the part of the plaintiff that connects either of these two events with the 1999 purchase of the UPA Business, which took place entirely in Germany, save for two telephone calls to Connecticut.

Plaintiff cites case law holding that "[t]he term 'transacting business' has been taken to mean 'a single purposeful business transaction.'" *Philippa Travell v. Haynes Kelly*, No. 539344, 1997 WL 139411, *5 (Conn.Super. Mar. 12, 1997). In that case, after an evidentiary hearing, the trial referee found that the defendant's "single, purposeful business transaction" was sufficient to bring the case within the court's jurisdiction under the predecessor statute to § 33–929(e), but that transaction is quite distinct from the facts in this case. The defendant in *Travell* was a foreign

corporation that was the franchisor of a Connecticut franchise, maintained an office in Connecticut, and had a Connecticut resident as an agent for sales in the region who solicited business on behalf of the defendant. The trial referee's conclusion that the defendant had "engaged in at least a single, purposeful business transaction" was well supported by the facts in that case, where at least two different contracts had been signed between the parties, and the parties' relationship had spanned over the course of at least two years. *Id.* at *1. The present case involves much more isolated and sporadic contact with the state, and falls expressly into the exceptions laid out above for conducting a single transaction that is complete within 30 days, or generally transacting business in interstate commerce.

### 4. Due Process Concerns

Even assuming that OLT could persuade the Court that Sick AG's limited contacts with the state are sufficient for Connecticut's long-arm statute, exercising jurisdiction over Sick AG in these circumstances would not comport with the requirements of the due process clause. "The due process clause of the Fourteenth Amendment permits a state to exercise personal jurisdiction over a non-resident defendant with whom it has certain minimum contacts ... such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Kernan v. Kurz–Hastings, Inc.*, 175 F.3d 236, 242 (2d Cir.1999). The "minimum contacts" test requires the Court to analyze whether Sick AG has "purposefully availed" itself of the privilege of doing business in Connecticut, thus rendering it foreseeable that it would be haled into court in this forum. *See World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

Plaintiff argues that it was foreseeable to Sick AG that it could be sued in the jurisdiction where it reviewed certain technology in 1994 and then deliberately acquired that same technology in a transaction in 1999. The problem with this argument, again, is that there is nothing connecting these two events except plaintiff's ipse dixit in its brief. Further, the factors to be considered in evaluating whether exercising jurisdiction would comport with traditional notions of "fair play and substantial justice," *Burger King v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), weigh against finding jurisdiction proper here. Courts look to the following factors, under the Supreme Court's admonition in *Burger King*: 2) the burden on the defendant; 2) the forum state's interest in adjudicating the dispute; 3) the plaintiff's interest in obtaining convenient and effective relief; 4) the court system's interest in obtaining efficient resolution of controversies; and 5) the shared interest of states in furthering substantive social polices. *Id.* Plaintiff has pointed to no interest on the part of Connecticut in adjudicating a dispute about a German corporation's purchase of a German subsidiary, and the burden on the defendant to litigate a case in Connecticut is apparent. Further, Sick UPA will remain a defendant, so plaintiff will not be foreclosed from obtaining full relief should it prevail on the merits.

### 5. Summary

To summarize, the long-arm statute does not provide for jurisdiction over Sick AG in this case, as the simple fact that consequences of tortious conduct were felt in Connecticut is insufficient to provide jurisdiction under § 33–929(f)(4). The website in this case also does not support jurisdiction under the "solicitation of business" prong, § 33–929(f)(2), because bind-

ing contracts for sale cannot be entered into online and the interactive aspects of the website channel the user to other subsidiaries. Finally, Sick AG has not "transacted business" in the state of Connecticut such that it should be subject to jurisdiction under § 33–929(e), as the few isolated contacts Sick AG had with Connecticut fall into the exceptions outlined in the statute. Due process also would not allow this Court to exercise jurisdiction over Sick AG. Accordingly, the claims against Sick AG are dismissed under Rule 12(b)(2), for lack of personal jurisdiction over the defendant.

## III. CONCLUSION

For the above reasons, the motion of defendants PE, BSW, EG & G, and Sick UPA to dismiss the complaint (Doc. # 37) is GRANTED in part and DENIED in part. The Court dismisses Count II against defendant EG & G; Count IV against PE and BSW; and Count VII against EG & G and Sick UPA. The remainder of the motion is denied. Defendant Sick AG's Motion to Dismiss (Doc. # 49) is GRANTED, as the Court does not have personal jurisdiction over this defendant.

IT IS SO ORDERED.