**ON–LINE TECHNOLOGIES, INC.**

v.

**PERKIN–ELMER CORP., et al.**

**No. 3:99CV2146(JBA).**

United States District Court,
D. Connecticut.

March 31, 2003.

314

Edward R. Scofield, Jacob D. Zeldes, Matthew Scott Hirsch, Zeldes, Needle & Cooper, Bridgeport, CT, David H. Berg, Joel Androphy, Wade Howard, Berg & Androphy, Houston, TX, Gabriel A. Berg, Berg & Androphy, New York, NY, Martin A Gould, Gould, Killian & Wynne, Hartford, CT, David J. Healey, Gary J. Fischman, Goldstein & Healey, LLP, Houston, TX, S. Dave Vatti, Shelton, CT, Alan Rosenthal, Rosenthal & Osha, Houston, TX, David Cabello, Wong, Cabello, Lutsch, Rutherford & Brucculeri, Houston, TX, for Plaintiff.

Jonathan B. Tropp, Natasha Marie Lipcan, Catherine Dugan O'Connor, Lorey Rives Leddy, Brian D. Porch, Jr., Day, Berry & Howard, Stamford, CT, Robert A. Brooks, Francis H. Morrison, III, Matthew J. Becker, Karen A. Moreno, Day, Berry & Howard Cityplace, Hartford, CT, Edward T. Colbert, Mark M. Supko, C. Kyle Musgrove, Kenyon & Kenyon, Washington, DC, for Defendants.

### Ruling on Motions for Summary Judgment [Doc. 160, 164 & 169]

ARTERTON, District Judge.

On–Line Technologies ("OLT") asserts that defendants misappropriated trade secrets during a series of visits to OLT's laboratory in 1994 and designed a product that infringes one of its patents. The patent infringement claim relates to defendants' gas cell, and the state law trade secret misappropriation and associated claims (fraud, breach of contract, and unfair trade practices) are based on OLT's allegation that its trade secrets were used in the development of two instruments designed and/or manufactured by defendants (the Spectrum One and the MCS100E). For the reasons set out below, defendants' motions for summary judgment on all claims in the Third Amended Complaint are granted.

### I. Background[1]

OLT, a small company that survived over the years primarily on government grants, planned to grow its business by entering into strategic alliances with larger, more experienced companies. OLT envisioned supplying its core technology, which it claims is superior to other technology available in the marketplace, to companies with established marketing and manufacturing capabilities. To that end, OLT and the defendants explored a possible licensing agreement, but after a series of visits to OLT's laboratory in 1994, defendants refused to license OLT's technology and the prospect of any planned collaboration between the companies ended.

While the technology at issue has expanded, OLT's theory of this case has remained the same: that in licensing negotiations with the defendants, it opened its laboratory doors to scientists associated with the Perkin Elmer entities in a series of visits in 1994, giving the scientists free reign (after executing a non-disclosure agreement) to learn its trade secrets, and that even though OLT met or exceeded defendants' "performance criteria" for the efficacy of OLT's technology required for a licensing agreement, defendants refused to license OLT's technology, but instead un-

---

1. The following summary is presented in the light most favorable to OLT, the non-moving party.

lawfully used what they learned from OLT in the development of their own products.

OLT points, in particular, to three occurrences: (1) defendants' assertion, in late 1994, that a satisfactory agreement could not be reached because OLT's technology was not up to par, even though internal documents and a subsequent letter from one of defendants' scientists show that defendants believed OLT's product was "a winner"[2]; (2) defendants' failure to return OLT's technical documents in its possession related to OLT's technology, despite representation that it had returned all documents; and (3) an email from Dr. Wolfgang Berkhahn, associated with the defendants, in which Berkhahn claims that he copied OLT's technology in the design of defendants' gas cell.[3]

## II.  Standard

Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Parker v. Sony Pictures Entm't, Inc.,* 260 F.3d 100, 111 (2d Cir.2001) ("A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on the plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.' ") (*quoting Celotex,* 477 U.S. at 324, 106 S.Ct. 2548); *Gallo v. Prudential Residential Servs., Ltd. P'shp.,* 22 F.3d 1219, 1223–1224 (2d Cir.1994) ("the moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case") (citations omitted).

The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("there is no issue for trial unless there is sufficient evidence in the record favoring the nonmoving party for a jury to return a verdict for that party"); *Matsu-*

---

**2.**  November 5, 1994 letter from Coates to Solomon, OLT Tab 70.  Dr. Coates, associated with the defendants, wrote: "I would like to state how truly sorry I am about the outcome of our proposed liaison, and the decisions that have been made by my colleagues in Germany.  For me, there seems to be no logical or rational reason for their decision.  As far as I am concerned, your system performed as expected and met the basic requirements of the application.  * * * I deeply regret not being a part of the market development of your interferometer.  It should be a winner, and I wish you every success in the future."

**3.**  Berkhahn, one of the scientists who visited OLT's laboratory in 1994, wrote to Peter Solomon of OLT: "[W]e were impressed by your long path gas cell and decided to design a cell with the same characteristics.  To avoid any infringement of patents, I asked Dick Fyans to provide all patents associated with your cell. I never got any paper.  Therefore we felt free to just copy it.  This includes manufacturing technology, the overall mechanical design and the cylindrical correction of the object mirrors."  OLT's Tab 8.

*shita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.") (citation and internal quotation omitted). In making this determination, the Court draws all reasonable inferences in the light most favorable to the party opposing the motion. *Id.* However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed.R.Civ.P. 56(e), and "some metaphysical doubt as to the material facts" is insufficient. *Matsushita Elec.*, 475 U.S. at 586, 106 S.Ct. 1348 (citations omitted).

### III. Patent Claims

OLT holds a patent ("the '143 patent")[4] on a particular variation of the White cell ("Folded Path Optical Analysis Gas Cell"), and claims that defendants manufacture a product that infringes, both literally and under the doctrine of equivalents, the '143 patent.

#### A. Background

The White cell, first described in a 1942 article by John White,[5] is essentially a vessel with light entrance and exit openings that is used to test samples of gas by measuring the optical absorption of the gas sample trapped in the cell. Gas is captured in the cell, and when light is directed into the vessel, the light bounces off mirrors located on either end, and is analyzed upon exiting the cell. The vessel is a "long path" gas cell because light, by bouncing back and forth within the short vessel, travels a longer path than it would if it only traveled in one straight line from one end to the other, and is also a "folded path" gas cell for the same reason: the lengthy path taken by the light is "folded" into a smaller vessel by using mirrors to bounce the light back and forth. With the light taking a longer path through the cell, the results are more accurate because the light beam is exposed to the gas longer than it is in cells with a shorter path.

While the basic concept of the White cell is now over sixty years old,[6] the invention covered by the '143 patent was found to be novel because it corrected the "astigmatism"[7] inherent in White's design. The specification explains:

> [I]t is the broad object of the present invention to provide a folded-path gas cell that is capable of higher radiation throughput[8] and less image blur, as compared to prior art cells of equal or greater size, to thereby afford better operating parameters and to optimize the performance of associated optical instruments, by preservation of resolution capability.

Col. 1, lines 33–39. The invention achieves this result by adding a cylindrical component or correction to the spherical objec-

---

4. U.S. Patent # 5,440,143

5. "Long Optical Paths of Large Aperture," J. Opt. Soc. Am., No. 32 (1942).

6. *See, e.g.*, Col. 1, Lines 9–23 (recognizing that folded path gas cells are "well known in the art" and derive from White's 1942 article).

7. "A defect of an optical system, as a lense or mirror, in consequence of which rays from a single point of an object fail to meet in a single focal point, thus causing the image of a point to be drawn out into a line and the images of lines having a certain direction to be less distinct than those of lines transverse to that direction." Webster's New International Dictionary of the English Language (Unabridged) at 170 (2d ed., 1961).

8. Higher "throughput" means more light coming out of the cell, which is desirable.

tive mirrors (which bounce the light back and forth within the cell):

> A folded-path gas cell employs an elliptical concave mirror in confronting relationship to two substantially spherical concave mirrors. At least one of the spherical mirrors, and usually both, are formed with an added cylindrical component to increase orthogonal focii coincidence and thereby to increase the radiation energy throughput characteristic of the cell.

'143 Patent Abstract.

The key issue in dispute between the parties concerns the cylindrical correction to the spherical mirrors, which constitutes the essential innovation of the '143 patent. Because it is undisputed that the accused cell achieves its salutary result by using *toroidal* objective mirrors (as, interestingly, does OLT's commercial embodiment[9]), the dispute is whether toroidal objective mirrors are the same as spherical mirrors with a cylindrical correction.

### B. Discussion

#### 1. Summary Judgment of Patent Non-Infringement

Title 35, Section 271(a) of the U.S.Code provides:

> Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

There are two varieties of infringement: literal infringement and infringement under the doctrine of equivalents. *See Vehicular Tech. Corp. v. Titan Wheel Int'l, Inc.*, 141 F.3d 1084, 1089 (Fed.Cir.1998)

("[A] claim is infringed only if each limitation in the claim is found in the accused device, either literally or by a substantial equivalent."). "[A]n accused product literally infringes if every limitation recited in the claim appears in the accused product, i.e., the properly construed claim reads on the accused product exactly." *Jeneric/Pentron, Inc. v. Dillon Company, Inc.*, 205 F.3d 1377, 1382 (Fed.Cir.2000) (*citing Amhil Enters. Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1562 (Fed.Cir.1996)). "Infringement may be found under the doctrine of equivalents when ... [1] every limitation of the asserted claim, or its equivalent, is found in the accused subject matter, [2] the latter differs from what is literally claimed only insubstantially, and [3] it performs substantially the same function in substantially the same way to achieve substantially the same result." *Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1444 (Fed.Cir.1997) (*citing, inter alia, Warner–Jenkinson Co., Inc., v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997)).

When considering a summary judgment motion addressed to the question of whether the accused product is the "patented invention," 35 U.S.C. § 271(a), a two-step process is used: first, the meaning, as a matter of law, of the particular claim or claims at issue is determined by the Court; and second, the Court determines whether there is any genuine disputed issue of material fact remaining for trial as to whether the accused product infringes, either literally or under the doctrine of equivalents, the properly construed claim or claims. *See Markman v. Westview Instruments*, 517 U.S. 370, 384, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); *Allen Eng'g Corp. v.*

---

**9.** This circumstance developed from the limited capabilities of OLT's machine shop, which could fabricate a toroidal correction but not a cylindrical correction. *See* Wright 12/11/01 Dep. at 177–178.

*Bartell Indus., Inc.,* 299 F.3d 1336, 1344 (Fed.Cir.2002); *Novartis Corp. v. Ben Venue Labs., Inc.,* 271 F.3d 1043, 1046 (Fed.Cir.2001) ("Summary judgment of noninfringement may only be granted if, after viewing the alleged facts in the light most favorable to the nonmovant and drawing all justifiable inferences in the nonmovant's favor, there is no genuine issue whether the accused device is encompassed by the patent claims.") (*citing Pitney Bowes, Inc. v. Hewlett–Packard Co.,* 182 F.3d 1298, 1304 (Fed.Cir.1999)).

### 2. Literal Infringement

■ The language of Claim 1 covers a gas cell that corrects astigmatism through the use of spherical objective mirrors with a cylindrical component added thereto. *See* Col. 5, Lines 37–54.[10] In light of the undisputed fact that the accused product corrects astigmatism through the use of toroidal objective mirrors, OLT has two alternative arguments as to why the accused product infringes the '143 patent: first, OLT argues that a toroid is "one method of making" a sphere with a cylindrical correction, and thus a gas cell with toroidal objective mirrors literally infringes Claim 1, which covers spherical mirrors with cylindrical corrections; second, OLT argues that the differences between a torus and the conic surface described in Claim 1 (which the parties refer to as a "c-sphere") are so "trivial and insignificant" that the accused product, while using objective mirrors that are

mathematically different from the objective mirrors covered by the '143 patent, still literally infringes the '143 patent.[11]

#### a. "One Method of Making"

OLT's original claim that a torus is one method of making a c-sphere is belied by the fact that both the patent itself and the evidence of record show that spherical objective mirrors with cylindrical corrections are not the same as toroidal objective mirrors. Critically, one portion of the specification describes the contour of the spherical objective mirrors as "approach[ing] toroidal":

> Each of the surfaces 62, 64 has a cylindrical component superimposed thereupon, thus providing different radii of curvature in two orthogonal planes and therefore a contour that approaches toroidal.

Col. 4, Lines 8–12 (emphasis added). Because mirrors with a contour which only "approaches toroidal" cannot be said to be actual toroidal mirrors, toroidal objective mirrors are not spherical objective mirrors with cylindrical corrections.

There is one portion of the specification that references toroidal mirrors:

> Line "b" in FIGS. 8 and 10 represents a spin axis spaced a distance "z" with reference to the outside surface of the end piece 38, *about which the surfaces 62, 64 may be machined;* the axes of revolution for *the toroids of the surfaces 62, 64* are designated "c."

---

**10.** While OLT claims that defendants fail to note that the mirrors described in Claim 1 are *"substantially"* spherical, Col. 5, Lines 44–45 (emphasis added), OLT never expounds a construction that harmonizes the import (if any) of the modifier "substantially" with the claims of the parties, and the parties agree that the patent covers spherical objective mirrors with cylindrical corrections. *See* Transcript of Oral Argument [Doc. # 205] (hereinafter, "Tr.") at 13 (counsel for OLT asserting

that the claim language "permits the patentee to capture ... any ... conic surface that can be described from a practical perspective as a sphere with cylindrical correction.").

**11.** The first argument was presented in the briefing, while the second argument was only raised at oral argument. *Compare* Pl.'s Mem. Opp. Summ. J. at 80 *with* Pl.'s Post–Argument Sur-reply at 4).

Col. 4, Lines 12–17 (emphasis added).[12] Two readings of this language are presented by this motion. First, "the toroids of the surfaces 62, 64" could be read as describing the patented objective mirrors of Claim 1, *see, e.g., Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996),[13] which necessarily requires a finding of infringement: if the spherical objective mirrors with cylindrical components are "defined" by the specification as toroids, then the defendants' toroidal objective mirrors must infringe Claim 1.[14] Second, "the toroids of the surfaces 62, 64" could be read as disclosing a way to *machine* the mirrors; that is, this is a disclosure of a method of manufacturing resulting in unclaimed (and therefore unprotected) mirrors. *See, e.g., Johnson & Johnston Assocs. v. R.E. Serv. Co., Inc.,* 285 F.3d 1046, 1054 (Fed.Cir.2002) (en banc) (recognizing that some patent specifications disclose alternatives that are not claimed in the patent claims themselves and are thus unprotected by the patent); *cf. SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1121 n. 14 (Fed.Cir. 1985) (en banc) ("Specifications teach. Claims claim.").

To accept the first position—that "the toroids of the surfaces 62, 64" actually defines the mirrors of Claim 1 as including toroidal objective mirrors—would cause the specification to become self-contradictory: on one hand, it would teach that the claimed mirrors are toroidal, while on the other hand it would teach that they only approach toroidal. Such a reading would vitiate "the standard construction rule that a term can be defined only in a way that comports with the instrument as a whole." *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 389, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) (citations omitted). Not only does such a reading fail to "preserve the patent's internal coherence," *id.* at 390, 116 S.Ct. 1384, it is also suspect because it requires a conclusion of definitional inconsistency by the patentees: if their intention was to define the mirrors of Claim 1 as toroidal mirrors, the specification would not also describe the contour of the mirrors as only approaching toroidal. *See Lear Siegler, Inc. v. Aeroquip Corp.,* 733 F.2d 881, 888–889 (Fed.Cir.1984) (while an inventor applying for a patent is permitted to be his own lexicographer, the meaning of an expression must be made reasonably clear and its use must be consistent within a patent disclosure) (citation omitted).

Even if there is any ambiguity in the patent document itself, the extrinsic evidence of record confirms this construction. OLT's expert Dr. Warren Vidrine states that both a torus and a c-sphere are "defined mathematical shapes" and their "mathematical definitions are not the same." Vidrine 5/2/02 Dep. at 220–221. "Mathematics is a very hard-edged science, and things that are different are not

---

12. The only other use of any variation of the word "toroid" in the '143 patent is found in Col. 4, Lines 39–42 ("Although an elliptical field reflector is preferred, other shapes (including spherical, toroidal, etc.) may be substituted if so desired, albeit with some expectation of loss of performance."). By its text, this refers to field mirrors and is unrelated to the objective mirrors at issue. No variation of the word "toroid" is present in any of the claims themselves.

13. "The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it. Thus, the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."

14. Assuming, *arguendo,* that the remaining limitations of Claim 1 not at issue in this motion are infringed by the accused gas cell.

the same." *Id.* at 221–222. David Wright, a co-inventor of the '143 patent, testified:

> Q: The mirrors that you ultimately made were toroids. And I think you've told me that conceptually those are different things but they are very close. And for your practical application you didn't perceive a material difference. Is that all accurate so far?
>
> A: That's accurate.

Wright 12/11/01 Dep. at 196–197. Robert Carangelo, the other co-inventor of the '143 patent, agrees:

> Q: Is it your testimony that a torus—a mirror with a toroidal shape and a mirror with a spherical shape with a cylindrical component added thereto are the same?
>
> A: They are not the same.

Carangelo 9/7/01 Dep. at 105. Finally, Peter Solomon of OLT agreed that although the terms are "interchangeable ... [f]rom a practical manufacturing point," they are not interchangeable "[f]rom a mathematical point." Solomon 8/16/01 Dep. at 446. The other portions of the deposition testimony of the above individuals which OLT points to do not create a genuine dispute of whether a torus and a c-sphere are the same or not, because such testimony is either legally conclusory *post*

*hoc* testimony of the '143 patent's inventors,[15] *see Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.,* 132 F.3d 701 (Fed.Cir.1997),[16] or vague and imprecise,[17] made without stating the basis of the opinion,[18] or explicitly accompanied by a disclaimer of any knowledge in the subject area.[19]

Thus, the patent (construed as a whole and, to the extent there is ambiguity, in light of the extrinsic evidence of record) can only be read to cover spherical mirrors with cylindrical corrections, not toroidal mirrors, and the reference to "the toroids of surfaces 62, 64" in Col. 4, Lines 12–17 must be read as disclosure of a method of machining, not a protectable claim.

Finally, OLT's claim[20] that the similarity between its commercial embodiment (which uses toroidal objective mirrors, *see supra* note 9) and the accused product (which also uses toroidal objective mirrors) weighs in favor of a construction of the patent that includes toroidal objective mirrors is unavailing as it reflects a flawed, rejected approach. *See Zenith Labs., Inc. v. Bristol–Myers Squibb Co.,* 19 F.3d 1418, 1423 (Fed.Cir.1994) ("As we have repeatedly said, it is error for a court to compare in its infringement analysis the

15. Wright 12/11/01 Dep. at 206–208 (claiming that he believes the patent covers toroids).

16. The testimony of an inventor concerning claim construction is "entitled to little or no consideration" because it "often is a self-serving, after-the-fact attempt to state what should have been part of his or her patent application." *Id.* at 706.

17. Solomon 7/10/00 Dep. at 54–55 (claiming that "amongst the ways to achieve" the "general principle described in our 143 patent" is a toroid).

18. Vidrine '143 patent expert report and Carangelo patent expert report (both supporting their claim of infringement of this element by pointing only to certain numbered documents

that are not identified by the parties in the record; for example, the claims chart of the Carangelo patent expert report notes infringement of this element only by stating, "Yes, shown in drawing PE 000740–000742").

19. Berkhahn 10/4/01 Dep. at 81–82 ("[A:] From my understanding, a cylindrical correction and a toroid is more or less the same * * * But we are on a very different field now. That's physics and optics. Q: Okay. You'll agree with me that this is not your area of expertise. A: I'm not a professional in optics, no. * * * ").

20. Pl.'s Mem. Opp. Summ. J. at 86.

accused product or process with the patentee's commercial embodiment or other version of the product or process; the only proper comparison is with the claims of the patent.") (citation omitted).

### b. A "Trivial and Insignificant" Difference

■ OLT's second argument, that a torus and c-sphere should be considered the same because they are so close (allegedly within the width of one human hair), is also without merit. In order to literally infringe an element, the claim must "read[ ] on the accused product exactly." *Jeneric/Pentron, Inc. v. Dillon Co.*, 205 F.3d 1377, 1382 (Fed.Cir.2000) (accused product contained 1.61% of cerium oxide, which was outside the claimed range of 0–1%) (citation omitted); *accord Johnston v. IVAC Corp.*, 885 F.2d 1574, 1580 (Fed.Cir. 1989) ("Where a claim does not read on an accused device exactly, there can be no literal infringement.") (citations omitted); *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed.Cir.1995) ("To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly.") (citations omitted); *Mas–Hamilton Group v. La-Gard, Inc.*, 156 F.3d 1206, 1211 (Fed.Cir. 1998) ("If even one limitation is missing or not met as claimed, there is no literal infringement.") (citations omitted); *Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542, 547 (Fed.Cir.1994) ("For literal infringement, each limitation of the claim must be met by the accused device exactly, any deviation from the claim precluding a finding of infringement.") (citation omitted).

### 3. Doctrine of Equivalents

■ Theoretically, OLT's infringement claim based on *minimal and nonfunctional differences between toroidal objective mirrors and the mirrors in Claim 1* could be better positioned under the doctrine of equivalents since the differences preclude a claim of literal infringement. *See, e.g., Johnston v. IVAC Corp.*, 885 F.2d 1574, 1580–1581 (Fed.Cir.1989) ("Where a claim does not literally read on an accused device because one or more limitations of the claim are not met exactly, infringement may, nevertheless, be found if such limitations are satisfied equivalently."). However, because the use of a toroidal correction was disclosed in the specification of the '143 patent and not claimed, the doctrine of equivalents is not available to OLT. A patent drafter's disclosure of subject matter in the specification, coupled with a failure to actually claim that subject matter, constitutes a dedication of the unclaimed subject matter to the public, barring application of the doctrine of equivalents to recapture to dedicated subject matter. *Johnson & Johnston Assocs. v. R.E. Serv. Co., Inc.*, 285 F.3d 1046, 1054 (Fed.Cir.2002) (en banc) (patent which disclosed use of steel substrate but claimed only use of aluminum substrate was not infringed under doctrine of equivalents by product using steel substrate; "Application of the doctrine of equivalents to recapture subject matter deliberately left unclaimed would 'conflict with the primacy of the claims in defining the scope of the patentee's exclusive right.'") (*quoting Sage Prods., Inc. v. Devon Indus. Inc.*, 126 F.3d 1420, 1424 (Fed.Cir.1997); citation omitted). Thus, OLT cannot claim infringement by use of toroidal mirrors under the doctrine of equivalents.

## IV. Trade Secret Misappropriation And Associated Claims

OLT also asserts that defendants' conduct constitutes misappropriation of trade secrets in violation of the Connecticut Uniform Trade Secrets Act, Conn. Gen.Stat. § 35–50 *et. seq.* ("CUTSA"), breach of contract (the non-disclosure agreements),

unfair trade practices in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen.Stat. § 42–110a *et. seq.* ("CUTPA"), and fraud. The five claimed trade secrets at issue in this case are the long path gas cell, Norton ignitor source, MCT linearization method, servo control algorithm and diode laser. The first two are alleged to have been directly misappropriated; that is, defendants' products (the Spectrum One and the MCS100E) are alleged to actually incorporate OLT's long path gas cell and Norton source secrets. The remaining secrets are claimed as "negative knowledge"; that is, although defendants' products do not actually contain the secrets, defendants were assisted in their development of their own products by their knowledge of OLT's MCT linearization method, servo control algorithm and diode laser.

CUTSA defines actionable "misappropriation" as follows:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without express or implied consent by a person who (A) used improper means to acquire knowledge of the trade secret; or (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was (i) derived from or through a person who had utilized improper means to acquire it; (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use * * * or (iii) derived

from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Conn. Gen.Stat. § 35–51(b).

■ Negative knowledge is one form of "using" trade secrets that is proscribed by CUTSA, because one may "use" a trade secret in ways other than direct manufacture and marketing:

"Use" is not limited to the traditional concept of manufacture or sale. The embodiment of significant secret improvements into an existing product can be trade secret use. Even if no products have been "built" embodying or using trade secrets, a trade secret is "used" if it has contributed to the acceleration of the introduction of the product.

Melvin F. Jager, Trade Secrets Law (hereinafter, "Jager, Trade Secrets") § 7.03[2][a] at 7–75–6 (citations omitted); *accord Foster–Miller, Inc. v. Babcock & Wilcox Canada,* 210 F.3d 1, 12 (1st Cir. 2000)[21]; *see also Omnitech Int'l, Inc. v. Clorox Co.,* 11 F.3d 1316, 1325 (5th Cir. 1994) ("a plaintiff must necessarily demonstrate that the defendant received some sort of unfair trade advantage"). The Restatement explains:

There are no technical limitations on the nature of the conduct that constitutes "use" of a trade secret .... As a general

---

**21.** "There was abundant evidence that BWC developed its hose far more quickly than otherwise would have been possible because it started with and proceeded from the knowledge that a viable hose could be constructed from nylon, Kevlar, and polyurethane. Moreover, there was evidence from which the jury reasonably could have found that BWC "used" the May 11, 1990 disclosure of U.S. Composites as the hose manufacturer to obtain an FMI hose sample from U.S. Composites, test the sample, and apply the test results in developing its own hose. Thus, the evidence adequately supported the jury's conclusion that BWC wrongfully used the confidential information disclosed on May 11, 1990."

matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a "use" under this Section. Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret ... all constitute "use."

Restatement (Third) Unfair Competition (hereinafter "Restatement") § 40 cmt c.[22]

### A. The Long Path Gas Cell Trade Secret

█ As described Section III (Patent Claims), OLT's gas cell is a device used to test samples of gas. Light is passed into the vessel, which holds the gas sample, and is analyzed as it exits the vessel to determine the composition or properties of the gas being tested. OLT's expert, Dr. Warren Vidrine, opines that defendants' long path gas cell and OLT's gas cell are "remarkably similar, having almost the same optical dimensions and mechanical construction and sharing design elements proprietary to OLT." Vidrine Rep. ¶ 55.

█ The OLT gas cell is the express subject of the '143 patent, which was issued August 8, 1995. After its disclosure in the patent, the OLT gas cell was no longer a "secret" under CUTSA because it ceased to "[d]erive[ ] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and could not have been "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Conn. Gen.Stat. § 35–51(d). This reasoning applies equally to identified but unclaimed details, such as the toroidal objective mirrors (one of the trade secrets used in OLT's commercial embodiment[23]). Regardless of the thorny issues presented by "after-the-fact justification for an actual trade secret theft," Jager, Trade Secrets Law § 5.04[4][a][ii] at 5–52, it is well settled that "information that is disclosed in a patent ... does not qualify for [trade secret] protection," Restatement § 39 cmt. f, because strong public policy considerations dictate that information disclosed in a patent be considered open, public and readily ascertainable by proper means, subject only to the restrictions of the patent laws themselves. In *Rototron Corp. v. Lake Shore Burial Vault Co.*, 712 F.2d 1214 (7th Cir.1983), the court explained:

[T]he Rototron process cannot be regarded as a trade secret, because the grant of a patent automatically constitutes full disclosure of the patented process. As stated in the District Court's opinion, "In order to foster invention and reward those who expand human knowledge, our nation grants a monopoly for the life of a patent in the invention or process disclosed in the claim. But the price for this reward is full disclosure. The knowledge passes into the public domain, and thereafter the paten-

---

**22.** The Restatement and scholarly treatises on trade secrets are particularly good interpretive sources in this field. *See* Conn. Gen.Stat. § 35–58 ("This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it.").

**23.** As concluded above, *see supra* note 9 and accompanying text, the commercial embodiment of the OLT gas cell differs from the precise claims of the patent in that the OLT gas cell uses toroidal objective mirrors, while the '143 patent covers only a cell using spherical mirrors with a cylindrical correction.

tee's only protection is that afforded under the patent law." These provisions of federal patent law prevail over any inconsistent State remedies. Hence Rototron had no protectable trade secret after issuance of its patents on the rotational molding process.

*Id.* at 1215 (footnote, internal quotations and citations omitted); *accord Scharmer v. Carrollton Mfg. Co.,* 525 F.2d 95, 99 (6th Cir.1975).

OLT offers no evidence to rebut defendants' showing that no defendant "used" any of the alleged trade secrets related to the gas cell before the '143 patent was issued on August 8, 1995. Dr. Wolfgang Berkhahn, the Perkin Elmer scientist responsible for the development of the Perkin Elmer entities' gas cell, testified that the design of the defendants' path gas cell began in 1996:

> Q: Let me ask you this: You represent here that in 1996, you suspected that there was an infringement when you started the design—"when we started the design."
>
> A: Uh-huh.
>
> Q: The design of what?
>
> A: The long path gas cell.
>
> \*    \*    \*    \*    \*    \*
>
> Q: [ ]Is that the long path gas cell that we referenced earlier with Dr. Wulf?
>
> A: There is only one long path gas cell[,] which was developed in the time between '96 and '98.

Berkhahn 10/3/01 Dep. at 210–211.

> Q: [ ]You were in charge of the UPA division, correct?
>
> A: Yes.

> Q: And it was your decision whether to proceed with a modified gas cell, correct?
>
> A: Uh-huh.
>
> Q: And you know that you didn't start to make a modified gas cell in 1995, correct?
>
> A: We started soon, but not that soon. Look, I cannot make at Perkin Elmer an R & D project without having it funded.
>
> Q: You didn't even propose to have it funded until fiscal year 1996.
>
> A: Uh-huh.
>
> Q: Correct?
>
> A: Yeah.

Berkhahn 10/4/01 Dep. at 55.[24]

OLT's evidence shows that during the period in which the Perkin Elmer entities were engaged in ongoing negotiations to license the OLT technology in 1994, they evaluated the technology they were considering buying. Even if such evaluation could constitute "acquisition" or "use" of a trade secret for CUTSA purposes, it cannot constitute "misappropriation" because it was done by express agreement in the hopes of forging a mutually-beneficial commercial relationship. *See, e.g.,* Henry H. Perritt, Jr., Trade Secrets: Practice Guide Ch. 9 (PLI 2001) ("Often, an owner of a trade secret enters into negotiations with someone who is interested in marketing, buying, or investing in the trade secret .... The other party is entitled, by an express agreement or one that is implied under the circumstances, to use the secret only for the 'limited purpose' intended by the owner in disclosing the secret."). These memoranda, which were written at a time when an agreement between the parties remained a possibility, cannot then constitute evidence of any gas cell development

---

**24.** Even OLT's complaint specifically alleges that defendants decided to design their gas cell in 1996. Third Am. Compl. ¶ 31.

by any defendants after negotiations terminated in November 1994, no matter how nefarious a spin OLT offers. Thus, on this record, it is undisputed that defendants did not unlawfully "use" the gas cell information contained in the patent until after OLT's patent had issued and the secrets passed into the public domain, even if defendants were unaware of the patent's existence.

After oral argument, OLT submitted a brief contending that not all of the "secrets" of its gas cell were disclosed in the '143 patent, and that defendants are liable for use of those aspects which were undisclosed, including, e.g., the specific aluminum alloy used in the manufacture of the cell. This was a reversal of course from OLT's briefing in the case, which claimed the long path gas cell secret as the "unique combination" of: (1) certain corrections to the mirrors inside the gas cell (these corrections being the essential innovation of the '143 patent), and (2) "other *known* components of gas cells generally." Pl's Mem. at 49 (emphasis added).

OLT's attempt to reverse course and argue that these "known" aspects of the cell are each individual trade secrets lacks any evidentiary support that any of these aspects are secrets. Vidrine's expert report identifies the secrets at issue in this case as: (1) the long path gas cell and (2) other components (the Norton source, the scan turnaround, method of MCT lineari-

zation and diode laser) of the analyzers at issue.[25] Vidrine's report does not claim any specific aspect of the cell (such as the aluminum alloy used in its construction) as an independent trade secret,[26] and OLT points to no other evidence in the record from which a jury could conclude that individual aspects of the cell are protected trade secrets. OLT's post-argument submission of a one page document prepared by counsel entitled "Confidential Information Shared With Perkin–Elmer: Gas Cell Information *Not* Included in the Patent or Brochure" [Doc. # 202 Ex. L], speaks only in the broadest of terms, contains no citation to the record, and is not itself evidence. *See* Fed.R.Civ.P. 56(c).

**B. Norton Source**

**1. Identity of the Norton 301T**

The Norton 301T is a ceramic ignitor that is primarily used as a gas ignitor, such as for furnaces. In the devices at issue in this case, however, it is used to produce the infrared radiation that is beamed into the White cell. OLT claims that the Perkin Elmer entities learned their Norton source secret during the lab visits beginning in April 1994, and thereafter misappropriated this secret. Despite OLT's persuasive evidence that Perkin Elmer learned of the Norton 301T from the lab visit and thereafter used that information,[27] the use of the Norton 301T ignitor for this specific purpose was not at that

**25.** The claimed secrets, including the gas cell, are each component parts of the analyzers (e.g., the Spectrum One, MCS100 and Multi–Gas 2000).

**26.** The most Vidrine's report says about these other aspects of the OLT cell is to label them "important aspects" and assert that they are "copied aspects." Vidrine Rep. ¶ 56. Moreover, even this description appears to be simply the basis upon which Vidrine's conclusion that the complete cell (which Vidrine does claim as a secret) was copied. Nowhere,

however, does Vidrine state that the alloy used in the construction of the cell, for example, is in and of itself a trade secret.

**27.** *Compare* Hoult 6/12/02 Dep. at 120 (testifying that prior to visiting OLT's laboratory in 1994, he "didn't know who Norton was") *with* OLT Tab 59 (letter from Perkin Elmer Germany to Norton asking: "we are looking for a company called Norton which manufactures gas ignitors. We want to use gas ignitors of this company for our instruments .... would you please send us information about

time a "trade secret" protected by CUTSA because it had already been disclosed as an infrared source in U.S. Patent No. 5,291,022 ("High Efficiency Infrared Source") ("the '022 patent"), issued in March 1994. In discussing the heater element of the invention covered by the '022 patent, the specification explains:

> The particular construction and materials of the heater element 41 are not crucial, and standard electrical resistance heater elements may be utilized which emit in the appropriate wavelengths, such as those commercially used for ignition plugs for furnaces and the like. Examples are ignitors produced by Norton Industrial Ceramics which are made of silicon carbide, including model No. 301–T for 10 volt operation and Model No. 401–T for 15 volt operation.

Col. 6, lines 45–54. As earlier discussed, trade secrets disclosed in a patent cease to "[d]erive[ ] independent economic value * * * from not being * * * readily ascertainable by proper means by * * * persons who can obtain economic value from its disclosure or use," Conn. Gen.Stat. § 35–51(d), and "the grant of a patent automatically constitutes full disclosure of the patented process." *Rototron Corp. v. Lake Shore Burial Vault Co.*, 712 F.2d 1214, 1215 (7th Cir.1983).[28]

### 2. Retroreflective Cavity and Special Engineering of Source Field Mirror

OLT further contends that the Norton source trade secret incorporated in defendants' devices goes beyond mere use of the model 301T ignitor as an infrared source (as disclosed in the '022 patent) and encompasses two reflective components related to the source which are not disclosed in that patent: a retroreflective cavity and a specially-engineered source field mirror. As to the retroreflective cavity, Dr. Vidrine avers that the infrared source used by defendants "use[s] metal mirrors to reflect radiation back to the source element to reduce the amount of heat which would otherwise be wasted. The '022 patent source design does not include any reflective mirrors." Vidrine 9/12/02 Aff. ¶ 3. Vidrine's trade secret report notes that the retroreflector used by defendants is "very similar" to OLT's retroreflector, Trade Secrets Report ¶ 44, in that it has a "similar[ ] shape[ ]," *id.* ¶ 75, and Vidrine opines that after defendants learned of the Norton 301T, they "rapidly adopted" a retroreflector similar to OLT's retroreflector, *id.* ¶ 72.

As to the special engineering of the source field mirror, Vidrine's trade secret report does not claim that the defendants' source field mirror is identical or meaningfully similar to OLT's source field mirror. Instead, he recites the shapes and focal lengths, and then concludes that the three different mirror types share the common characteristic of being a good match to the 301T:

> The OLT Norton source module, which needs to supply collimated light to the

---

your gas ignitors (especially about type '301 T') ... ").

**28.** Thus, the fact that the disclosure of the Norton 301T in this patent was apparently unbeknownst to either plaintiff or defendants is not relevant. Defendants' analogy offered at oral argument is illustrative on this point but requires modification: "It may be that On–Line told Perkin–Elmer that the world was round and thought it was a secret, and that Perkin–Elmer thought so too. The moment Perkin–Elmer learns that every child learns it in grade school, it's free to use it. If it's not really a secret, it's really not a secret." Oral Argument Transcript [Doc. # 205] at 85. More correctly stated, Perkin Elmer is free to use the knowledge of the earth's spherical shape *whether or not* it has learned what every child learns in school. If it is not really a secret, it is really not a secret.

interferometer, uses a paraboloid with 1.25" focal length. The P–E 100E source module, which needs to supply a converging beam to the gas cell, uses an ellipsoid with 0.89" focal distance to the source. The P–E Spectrum One source module, which needs to supply a collimated beam to the interferometer, uses a paraboloid with 1.57" focal length.

The use of paraboloids and ellipsoids as source field mirrors is not novel or unique in itself. The connection with OLT's proprietary technology is OLT's study of the igniter characteristics, particularly the igniter's very small hot area which necessitates short-focus field mirror designs are good optical engineering solutions matching this OLT-determined small hot area with the desired beam characteristics of the respective instruments.

Vidrine Trade Secret Report ¶¶ 77–78.

Apart from whether these two features constitute trade secrets, defendants point to the absence of any evidence that either the retroreflective cavity or the special engineering of the source field mirror was ever shown to, observed by, or used by any of the Perkin Elmer-related staff. Defendants submit the affidavit of Robert Hoult, a Perkin Elmer scientist, which contains an unrebutted account of the independent development, years earlier, of the Perkin Elmer entities' entire source assembly, *see* Hoult 3/11/02 Decl. ¶ 13, and Hoult avers that he "was not aware that On–Line used a retro-reflector in their source assembly and, indeed, the description in my trip report … that the source 'hangs down' appears inconsistent with the use of a retro-reflector," *id.* In rebuttal,

OLT proffers: (1) the Hoult Trip Report, (2) the Coates Performance Criteria, and (3) Tabs 106, 107 and 109. *See* Local R. 9(c)(2) Statement ¶¶ 42 & 45. The Court concludes that OLT's evidence is insufficient to create a genuine issue of material fact on this issue.

The Hoult trip report refers only to "source collimation [being] an off-axis parabola machined directly on the end of an aluminum cylinder," [29] and makes no mention of any special engineering of the source field mirror to utilize special characteristics of the 301T's hot spot, or of the retroreflective cavity. The Coates Performance Criteria (OLT's Tab 2) refers generally to the source being a "Norton" source, Tab 2 at 9, and an October 11, 1994 internal Perkin Elmer email (included in Tab 2) contains a heading "Source and Optics" and states: "The source used is standard. Our investigation in Germany showed that only in Germany 5 manufacturers of photometers use this source. We have all capacity available to calculate the optics ourselves." Thus, Tab 2 confirms that defendants were shown or discovered that the source was the Norton 301T, but nothing in Tab 2 shows they learned of the secret retroreflective cavity or the secret special engineering of the source field mirror.[30] The remaining citations ("see also") to Tabs 106, 107 and 109 serve no rebuttal purpose because those documents are not claimed to have ever been seen by anyone associated with any Perkin Elmer entity. *See, e.g.,* Pl.'s Mem. at 57–59 (discussing Tabs 106, 107 and 109 in terms of the economic value and secret nature of the information contained therein, not as docu-

**29.** Hoult Trip Report (OLT's Tab 46) at PEC0907.

**30.** There is no evidence from which a jury could conclude that the undifferentiated refer-

ence to "optics" in the October 11, 1994 email includes the retroreflective cavity or special engineering of the source field mirror.

ments to which anyone from a Perkin Elmer entity was privy).[31]

Despite Vidrine's suspicion that defendants saw or used the claimed secrets based on the "similar shape" and "rapid adoption" of their retroreflectors and on the "good fit" between the source field mirrors used in defendants' devices and the Norton 301T, it is undisputed that the retroreflectors used by defendants are not identical to OLT's retroreflector. Vidrine's listing of the different focal lengths and shapes of the parties' source field mirrors is no evidence of similarity from which any inference can be drawn that defendants saw and misappropriated OLT's reflective component secrets. Thus, there is no evidence from which a jury could return a verdict in OLT's favor on the source assembly misappropriation claim.

### C. MCT linearization, Servo Control and Diode Reference Laser Trade Secrets

As to these three secrets, OLT claims defendants enjoyed economically beneficial use of its "negative knowledge," recognizing that these features have not become a part of either the MCS100E or the Spectrum One. Because OLT points to no evidence demonstrating that these claimed negative knowledge secrets were ever used in any way in the research and development of the MCS100E, its claims will be considered only as to defendants' development of the Spectrum One.[32]

#### 1. MCT Linearization

After infrared light has been passed through the gas sample in the gas cell, the resulting output is directed toward a detector. The Spectrum One, for most applications, uses a DTGS detector that features a high degree of "linear correlation" between the input signal and the output signal. An MCT detector is used for some applications, but as it has a non-linear correlation between the input signal and the output signal, some method of "linearizing" the correlation is desirable.

While acknowledging that defendants have used MCT detectors with their FTIR spectrometers since the 1980s, *see* Vidrine 5/2/02 Dep. at 75, and that defendants' linearization method is not the same as OLT's, *id.* at 172–173, OLT asserts that defendants received a "head start" on de-

---

**31.** OLT's denials in ¶¶ 42 and 45 of its Local R. 9(c)(2) Statement thus lack supporting evidence, leaving defendants' claims of OLT's lack of evidence uncontradicted on this point. "One important purpose of Local Rule 9(c) is to direct the court to the material facts that the movant claims are undisputed and that the party opposing the motion claims are disputed. Otherwise the court is left to dig through a voluminous record, searching for material issues of fact without the aid of the parties." *N.S. v. Stratford Bd. of Educ.,* 97 F.Supp.2d 224, 227 (D.Conn.2000); *cf. Mr. A. v. Weiss,* 121 F.Supp.2d 718, 721 (D.Conn. 2000) (collecting cases). Accordingly, the Court has relied on the parties' 9(c) statements as an essential guide to this multi-volume summary judgment record.

**32.** The Vidrine report lists these three secrets as applicable to the Spectrum One. *See* Vid-

rine Trade Secrets Report at 2. In Vidrine's deposition testimony he summarizes any amendments to his trade secrets report and does not include any claim that the MCT linearization, servo control and diode laser secrets are applicable to the MCS100E. *See* Vidrine 5/2/02 Dep. at 171–177. OLT denies defendants' Local R. 9(c)(1) statement that these three secrets are not applicable to the MCS100E, citing to the Coates Performance Criteria (OLT's Tab 2). OLT's denial is ineffective as the cited evidence does not support its denial since the Coates Performance Criteria was written when negotiations between the two companies were still underway and does not constitute evidence that defendants subsequently made use of the alleged secrets in the development of the MCS100E.

veloping their linearization method by trying out OLT's linearization method, *id.* at 175. In support of summary judgment, Hoult avers that the linearization method used by defendants in the Spectrum One is the one he developed and patented in 1987. Hoult Decl. ¶¶ 15–16. Hoult further avers that he "has always preferred [his] own method of linearization to On–Line's and, from the time of my visit to On–Line to date, neither Perkin–Elmer nor PerkinElmer, Inc., has ever used On–Line's MCT linearization method." *Id.* ¶ 18.

In rebuttal, OLT proffers: (1) defendants' awareness of OLT's MCT linearization method, and (2) Vidrine's opinion that (a) defendants needed a linearization method, (b) they demonstrated a clear interest in OLT's method, (c) they planned to use linear correlation, and (d) the existence of a "parameter value transfer consistent with three parameter correction that is stubbed out"[33] in defendants' Spectrum One. *See* Vidrine 5/10/02 Dep. at 321–324. OLT also points to Hoult's deposition testimony, in which he initially states that "we never attempted to use On–Line Technologies' linearization method as described to me during my visit," Hoult 6/14/02 Dep. at 62, but then agrees that "hooks," which are reserved locations where functionality could be added at a later stage, *id.* at 63, could have been left open in the Spectrum One for the later addition of an MCT linearity correction filter:

Q: Were you aware that hooks were being included, at least in terms of the February 28th 1998 proposal, for an MCT linearity correction filter?

A: To the best of my recollection, no, I wasn't.

Q: Could additional algorithms and hooks for additional algorithms, Dr.

Hoult, mean potential or proposed modification of the linearization scheme that was originally proposed back in 1994 with regard to the Chameleon project?

A: I'm not sure what was proposed back in 1994 for the Chameleon project. But broadly, that's what appears to be the case.

*Id.* at 64–65.

Notwithstanding Vidrine's conclusions that defendants needed a linearization method and were interested in OLT's method, the record is undisturbed that defendants used, and have always used, their own linearization method. Hoult's deposition testimony that additional "hooks" could "mean potential or proposed modification of the linearization scheme" by its terms means no OLT secret has yet been used. Similarly, Vidrine's conclusion that certain parameters were "stubbed out" is consistent only with some future possible use of an OLT trade secret—not an actual, current use. As OLT appropriately conceded at oral argument, hypothetical future wrongdoing related to an OLT trade secret is not actionable until it takes place. *See* Transcript of Oral Argument [Doc. # 205] at 57. On this record, no reasonable jury would have a basis for concluding that OLT's linearization method accelerated or assisted the introduction or development of the Spectrum One, or otherwise provided any trade advantage to defendants.

### 2. Servo Control

"Servo drive control" is the piece of the microprocessor-driven electronic device that moves the mirror that scans the interferometer, serving the objective of being

---

**33.** A stubbed out parameter is a "hook," or a reserved location in which functionality can be added later. *See* Pl.'s Mem. at 65.

able to reverse direction quickly and smoothly, so as not to bump or disrupt any of the delicate optical instruments. The speed and direction of the scanning mirror are controlled by the servo control.

It is undisputed that OLT's method was successful and that defendants did not use this method. *See* Vidrine 5/10/02 Dep. at 176. Defendants proffer Hoult's averment that "[t]he servo design used in the Spectrum One was developed in 1985 and first offered for sale in 1987 .... [T]he Spectrum One's servo control is based entirely on a circuit and firmware used by Perkin-Elmer at least as far back as 1987, without any design intervention from me concerning the scan turnaround or any other servo function after my visit to On-Line." Hoult Decl. ¶ 20. In opposition, OLT again points to Vidrine's expert report and testimony, which is based on: (1) defendants' interest in and knowledge of OLT's servo control approach, and (2) "stubbed out" parameters:

Q: What evidence do you have to suggest that in using the parameters, or attempting to use the parameters that were not implemented Perkin Elmer relied in any respect on the parameters that On–Line had disclosed to it as opposed to deriving them independently?

\* \* \* \* \* \*

[Vidrine]: I'll try to answer at least the first part of the question.

The evidence I have seen is that Perkin Elmer did know, to some detail, the approach to—Online's approach to the servo.

Second of all, that they had—they showed specific interest in the methods and merits of that design, and third, they imported but did not use a—a stubbed-out parameters, so to speak, that have no value to the scheme they

finally use, and were used in either On–Line's scheme or a similar scheme.

Vidrine 5/10/02 Dep. at 291–292.

Vidrine admits, however, that he cannot determine whether defendants misappropriated or instead fortuitously used another plan:

So I'm faced with two possibilities, either of which may exist, either they tried out On–Line's scheme using their knowledge of On–Line and for whatever reason they erased it and used an older scheme at the end, or somebody created out of their brain a similar scheme and used similar parameters that may or may not have been the same, and I have no way of confirming or denying that secret possibility.

But as an engineer that possibility does not seem very realistic, because when someone creates a new, innovative approach there are generally a lot of tracks in the engineering documentation of the four bankers boxes that are referred to for predominantly rights documentation, and those represent a lot of work, a lot of fishing around and trying things back and forth that occurs whenever people use a new scheme.

I don't see that in the Perkin–Elmer documentation, which leads me to believe that whatever other scheme Perkin–Elmer used it was something that they had a bit of information, knowledge, about, and didn't have to use this messy random process that occurs in real development.

Now, I still don't know what that scheme is. It's something similar, *but maybe they got it from another company, I don't know.*

*Id.* (emphasis added).

■ Even if the absence of engineering "tracks" provides a sufficient basis for concluding that defendants were aware of

OLT's servo control approach and compared it to the approach they had been using instead of starting from scratch, nothing in the record provides any basis for concluding that defendants gained any advantage or were assisted in any way in the development of their servo control. Vidrine's testimony is that defendants either (1) "created out of their brain a similar scheme" (which would provide no basis for liability) or (2) "tried out On–Line's scheme using their knowledge of On–Line and for whatever reason they erased it and used an older scheme at the end." *Id.* This latter possibility (that OLT's approach was a non-starter) is consistent with Hoult's averment that the Spectrum One's servo control is based on a design that has remained unchanged since 1987, and precludes a conclusion that defendants derived any advantage or aid in the development of their products, even if their experimentation with OLT's approach as an alternative to their extant approach was proved. *See* Trade Secrets Law § 7.03[2][a] at 7–75–6 ("a trade secret is 'used' if it has contributed to the acceleration of the introduction of the product") (citations omitted); Restatement (Third) Unfair Competition § 40 cmt. c ("relying on the trade secret to *assist or accelerate* research or development" constitutes "use") (emphasis added).[34] The Court finds no authority that a dead end flirtation with another's trade secret which results in no profit from, or disclosure or waste of, the secret can support a finding of misappropriation and thus no triable issue is presented by this evidence.

### 3. Diode Laser

Dr. Vidrine's report has little to say about the diode laser secret:

The planning documents for the Spectrum One project clearly indicate that a laser diode was planned as the reference laser for the product. However, no part number for a diode laser seems to exist in the final version of the instrument. [M]emos, notebooks [and deposition testimony] may be necessary in order to determine the exact nature and extent of P–E's utilization or attempted utilization of OLT's technology.

Vidrine Trade Secrets Report at 22 (footnotes omitted). At the time of the 1994 lab visits, defendants were using a Helium–Neon (or NeNe) laser and the Spectrum One has never been built with a diode laser. *See* Hoult 3/11/02 Decl. ¶ 22. At the time of the lab visits and for a short time thereafter, defendants investigated the possibility of switching to a diode laser. *See* Hoult 6/14/02 Dep. at 74–76. OLT was using a diode laser at the time of the 1994 lab visits, and its use of the diode laser was well-regarded by defendants. *See,* *e.g.,* Hoult Trip Report (OLT's Tab 46) at PEC0906 ("Laser[:] low cost, high reliability, solid state laser integrates directly into interferometer, replacing HeNe"). Coates and Hoult expressed concern regarding the diode laser's frequency drift and associated mode hop. *See* Hoult Trip Report at PEC0909; Coates Performance Criteria at ¶ 1.4. Vidrine opines that OLT's method for stabilizing the laser to avoid these problems is what constitutes OLT's unique innovation:

Q: What was novel or unique about On–Line's approach to the study of laser diodes for an FTIR spectrometer?

A: My understanding is that they attempted both to stabilize the laser and

---

**34.** *See also Dunsmore & Associates, Ltd. v. D'Alessio,* No. 409906, 26 Conn. L. Rptr. 228, 2000 WL 124995, *9 & *9 n. 8 (Conn.Super. Jan 6, 2000); *Classic Limousine Airport Ser-* *vice, Inc., v. Alliance Limousine LLC,* No. CV 990174911, 2000 WL 1207404, * 2 (Conn.Super.Aug.1, 2000).

simultaneously to create a self-correction scheme that corrected for the residual instabilities of the laser.

Vidrine 5/10/02 Dep. at 297. OLT attempted this stabilization by "thermal regulation and thermal feedback," *id.*, and was quite successful. *See* Vidrine 5/10/02 Dep. at 294–295 (while others were investigating the use of a laser diode in a precision FTIR spectrometer, no one "[got] anywhere near as far as On–Line did"). More importantly, OLT's method was regarded as successful by defendants. *See* Coates Performance Criteria (OLT's Tab 2) at ¶1.5 (OLT's stabilization process "works well"); Hoult Trip Report (OLT's Tab 46) at PEC0906.

Thus, the record reflects that: (1) defendants were considering using a diode laser; (2) use of a diode laser would require a stabilization process; and (3) defendants were interested in OLT's stabilization process and regarded it as successful. Critically, however, the uncontradicted evidence is that despite these three facts, defendants' diode laser studies took a different course:

> [O]ur diode laser studies were directed differently from On–Line's. As I understood On–Line's work, On–Line had attempted to address certain shortcomings of the diode laser by using the heat-sink on the laser to slow its temperature fluctuations and by calibrating individual scans by reference to a water vapor absorption line in the spectrum. In contrast, my colleagues attempted to achieve wavelength stabilisation of the diode using either an etalon or a gas absorption line. Further, OLT's laser diode operated at a wavelength of approximately 830 nm. The longest wavel-

ength we investigated was only 780 nm, and we were aiming for smaller wavelengths still. OLT's spectral range was restricted by their choice of diode and was not appropriate for Perkin–Elmer's general purpose needs.

Holt 3/11/02 Decl. ¶24. Vidrine claims that this constitutes "negative knowledge"—avoidance of the mistakes of the original innovator:

> [T]here is an indication that there was not any substantial amount of trying a multitude of different approaches. With lasers the early part of a development project has to be trying a variety of approaches as On–Line did.

Vidrine 5/10/02 Dep. at 305.[35]

■ The flaw in OLT's position is that defendants are alleged to have gained some advantage by avoiding the *successes* of OLT. Misappropriation can be proved by evidence of an advantage gained by building upon another's successful secrets or deliberately steering clear of another's developmental missteps and dead ends (with their attendant waste of resources). However, OLT does not demonstrate how a reasonable jury could take evidence that defendants looked at OLT's successful innovation and then steered clear of what OLT had done to logically conclude that defendants gained any advantage from their knowledge of OLT's secret stabilization method. Thus, OLT lacks evidence of defendants' unlawful "use" of OLT's trade secret resulting in any type of benefit gained and there is no genuine issue of fact for trial as to the diode laser secrets.

### D. Remaining State Law Claims

#### 1. Fraud

CUTSA provides:

---

**35.** OLT alternatively points to internal documents which it claims show defendants starting where OLT left off. However, the documents show only that defendants were attempting to stabilize the diode laser, and

the claimed secret is the *method* of stabilization. *See* Vidrine 5/10/02 Dep. at 297. The uncontroverted testimony is that defendants' attempted method of stabilization is different from OLT's. *See* Hoult 3/11/02 Decl. ¶24.

(a) Unless otherwise agreed by the parties, the provisions of this chapter supersede any conflicting tort, restitutionary, or other law of this state pertaining to civil liability for misappropriation of a trade secret.

(b) This chapter does not affect: (1)[c]ontractual or other civil liability or relief that is not based upon misappropriation of a trade secret; (2) criminal liability for misappropriation of a trade secret; or (3) the duty of any person or state or municipal agency to disclose information pursuant to section 1–210, sections 31–40j to 31–40p, inclusive, or subsection (c) of section 12–62, or wherever expressly provided by law.

Conn. Gen.Stat. § 35–57.

■ OLT's fraud claim is based on its allegation that defendants used: (1) the "ruse" of a possible joint venture in order to get into OLT's laboratory to steal its trade secrets, and (2) the false representation that defendants had returned OLT's documents in order to continue their misappropriation or lull OLT into a false confidence that there would be no misappropriation. In light of CUTSA's preemption provision, OLT appears to concede that to the extent that the "fraud" is coincident with conduct actionable under CUTSA, it would be preempted by CUTSA, see Pl.'s Mem. at 44, and therefore a claim of fraud "require[s] evidence which is distinct from the elements the Plaintiff is required to prove under CUTSA," id.

Notwithstanding its argument to the contrary, OLT's entire fraud claim is built on the theory that the two alleged fraudulent actions resulted in or furthered misappropriation of trade secrets: defendants' bad faith bargaining as a ruse to induce OLT to disclose its trade secrets, and defendants lying about returning the documents to secure further opportunity to continue their misappropriation. These are allegations of a breach of "duties imposed by law in order to protect competitively secret trade information," Commissioner's Comment to UTSA § 7, and do not go beyond a "tort, restitutionary or other law of this state pertaining to civil liability for misappropriation of a trade secret," § 35–57(a); they are thus preempted.[36]

### 2. CUTPA

■ The complaint claims three acts as actionable under CUTPA:

(1) improperly using Plaintiff's trade secrets and confidential information to design, manufacture, and market a gas analyzer and a FT–IR spectrometer known as the Spectrum One; (2) representing to the international market that the *innovations found in Plaintiff's gas analyzer and FT–IR spectrometer known as the Spectrum One were Defendants'*; [and] (3) representing as Defendants' own, Plaintiff's trade secrets and confidential information in the sale of Defendants['] UPA and Analytical Instruments businesses.

Third Am. Compl. ¶ 74. The first act is clearly a restated CUTSA allegation, and the second two are two consequences that flow inexorably from virtually every CUTSA violation, because when a product is built from a misappropriated idea, the subsequent manufacture, sale or use of that product is an implicit misrepresentation that the product is the lawful fruit of the misappropriator's labor, unless the misap-

---

**36.** *See, e.g., Thomas & Betts Corp. v. Panduit Corp.,* 108 F.Supp.2d 968 (N.D.Ill.2000) (holding preempted, under almost identical provision of Illinois Trade Secrets Act, a common law fraud claim based on factual allegations of misrepresentation, concealment and mendacity regarding the procurement and use of trade secrets).

propriator publicly trumpets its tortious conduct.

Because the CUTPA count alleges nothing more than CUTSA violations and their inevitable consequences, summary judgment is appropriate in light of the conclusion that no reasonable jury could find a CUTSA violation.[37]

### 3. Breach of Contract

OLT points to two claimed contracts: the written non-disclosure agreement signed by Solomon and Fyans, and the purported oral agreement that all information would be confidential. Both alleged contracts are nothing more than agreements not to disclose trade secrets [38] and OLT concedes that neither alleged contract provides any more protection than would be afforded under CUTSA. *See* Pl.'s Mem. at 72. Thus, because no reasonable jury could find a CUTSA violation, there can be no breach of contract.[39]

## V. Conclusion

For the reasons set out above, the Court concludes that no triable issue of fact remains as to any claim in OLT's Third Amended Complaint. Defendants' motions for summary judgment [Docs. 160, 164 & 169] are GRANTED. The Clerk is directed to close this case.

IT IS SO ORDERED.

---

**37.** The Court does not address defendants' alternative argument that OLT's CUTPA claim is preempted by CUTSA.

**38.** In OLT's complaint the breach of contract count refers only to the information defendants learned during their visit in 1994—which is not distinguished from the alleged trade secrets in the prior count of the complaint. *Compare* Third Am. Compl. ¶¶ 60–63 (breach of contract count) *with id.* ¶¶ 49–59 (misappropriation count). *See also On–Line*

*Techs. v. Perkin Elmer Corp.*, 141 F.Supp.2d 246, 261 (D.Conn.2001) ("OLT has plead nothing that is not a protectable trade secret").

**39.** The Court notes that OLT's breach of contract claim does not encompass failure to return documents, *see* Third Am. Compl. ¶ 61, as allegedly required by the written non-disclosure agreement.